Filed 9/4/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WA SOUTHWEST 2, LLC et al., | |
| Plaintiffs and Appellants, | G050445 |
| v. | (Super. Ct. No. 30-2012-00613565) |
| FIRST AMERICAN TITLE INSURANCE COMPANY et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from judgments of the Superior Court of Orange County, Kim Garlin Dunning, Judge.  Affirmed.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Eric V. Anderton for Plaintiffs and Appellants.

Rutan & Tucker, Layne H. Melzer and Karen E. Scott for Defendant and Respondent First American Title Insurance Company.

Morgan, Lewis & Bockius, Robert Brundage, J. Warren Rissier and Jordan McCrary for Defendants and Respondents Trammell Crow Company and CBRE, Inc.

Lester & Cantrell, Mark S. Lester, David Cantrell and Colin A. Northcutt for Defendant and Respondent Hirschler Fleischer.

This lawsuit arose from the rubble of a failed multimillion dollar investment in commercial real estate. The trial court sustained a series of demurrers and entered judgments of dismissal as to numerous defendants. We affirm the three judgments of dismissal at issue here because the applicable statutes of limitations foreclose recovery.

PROCEDURAL HISTORY

Plaintiffs[1] are seven investors in Southwest Corporate Center (the Property), a three-story office building in Tempe, Arizona. The 30 defendants played various roles in acquiring the Property and marketing ownership shares therein to plaintiffs.

Plaintiffs filed their initial complaint in November 2012. Three amended complaints followed in response to motion practice by defendants. This appeal does not involve the parties from whom plaintiffs actually purchased their investments, including defendant WA Southwest Acquisitions, LLC (Acquisitions). Instead, this appeal concerns three judgments of dismissal entered on May 15, 2014, in favor of four defendants (the respondents to this appeal) on the periphery of the transaction: (1) First American Title Insurance Company, which provided escrow and closing services in connection with the acquisition of the Property; (2) Hirschler Fleischer, a law firm that worked on the investment offering and prepared a tax opinion in connection therewith; (3) Trammell Crow Company (Trammell Crow), which acted as real estate broker for the original seller of the Property and then entered into a property management and leasing

---

[1] Plaintiffs (and appellants) are (1) WA Southwest 2, LLC; (2) WA Southwest 15, LLC; (3) WA Southwest 19, LLC; (4) James Shee; (5) Jensen Enterprises, Inc.; (6) Thomas Olson; and (7) LaVonne Misner.

agreement with plaintiffs; and (4) CBRE, Inc. (CBRE), which acquired Trammell Crow and became its successor in interest.[2]

For purposes of this appeal, the 13 causes of action listed in the third amended complaint can be boiled down to breach of fiduciary duty claims (against all respondents), fraud claims (against all respondents), a legal malpractice claim against Hirschler Fleischer, and a conversion claim against Trammell Crow and CBRE.

FACTS

In conducting our de novo review, we "must 'give[] the complaint a reasonable interpretation, and treat[] the demurrer as admitting all material facts properly pleaded.' [Citation.] Because only factual allegations are considered on demurrer, we must disregard any 'contentions, deductions or conclusions of fact or law alleged . . . .'" (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 957.)

By stipulation, the parties agreed to the authenticity of certain operative documents that were in plaintiffs' possession at the time of their investments, including the confidential private placement memorandum and the purchase agreements signed by the plaintiffs. Plaintiffs did not object (below or here) to the use of these documents in connection with defendants' demurrers. Like the trial court, we rely on these documents as if they were exhibits to the operative complaint. (See *SC Manufactured Homes, Inc. v.*

---

[2] Three other defendants were also dismissed from the action following successful demurrers, as discussed in a concurrently filed opinion. (*Olson et al. v. Steckler & Wynns Insurance Services, Inc. et al.* (Sept. 4, 2015, G050455) [nonpub. opn.].) It appears from a comment made by the court that at least some of the remaining defendants were in the process of arbitrating plaintiffs' claims.

3

*Liebert* (2008) 162 Cal.App.4th 68, 83 ["If the allegations in the complaint conflict with the exhibits, we rely on and accept as true the contents of the exhibits"].)[3]

*Allegations of Wrongdoing*

The essence of plaintiffs' case is that they were misled (by a variety of misrepresentations and misleading statements) about the "sales load" of their investments (i.e., the fees, expenses, and commissions paid) and the risks they were required to incur as a result of their investments. According to plaintiffs, they would not have invested in the Property had they known that the total sales load percentage actually exceeded the 15 percent capital gains tax they had sought to defer by making the investments. The respondents to this appeal (i.e., an escrow company, a law firm, and two real estate broker/management firms) participated in the investment transactions and knew about plaintiffs' sensitivity to the "sales load," but did not warn or inform plaintiffs about the true nature of the investment.

Plaintiffs "had cash from a prior sale of real property with deferred long term capital gain on deposit with a qualifying intermediary which met the requirements of Internal Revenue Code Section 1031 . . . ." Syndicated tenancy-in-common acquisitions of real property (like the structure of the investment in the Property) can be "used to defer gain on 'like-kind' real property sales so the gain realized by the taxpayer-investor . . . on a sale of real estate . . . can be invested on a tax deferred basis in a 'like-kind' property . . . , here the fractional interest [i]n the Property."

A particular alleged oral misrepresentation made by certain defendants was, in substance and effect, the following: "'I recommend this Southwest Corporate Center

---

[3] Hirschler Fleischer's request that we take judicial notice of the private placement memorandum is unnecessary, as the private placement memorandum and related documents are already in the record and were treated like exhibits to the third amended complaint by the trial court, without objection by plaintiffs.

tenant in common investment because it has been subjected to thorough due diligence review, is designed and structured by experts for the tenants in common, offers long term professional experienced management and leasing and will allow you to invest more of your money in income producing property because the sales loads are less than 10% while the taxes you will have to pay if you do not timely invest will be 15%.'"

From December 2005 to March 2006, plaintiffs collectively invested $5,050,000. But "[a]fter all undisclosed and misrepresented Sales Loads are considered, only $3,780,000 was available for investment, resulting in true Sales Loads that exceeded 20%, i.e., a material increase" from the amount represented and "more than the 15% capital gains tax sought to be deferred." This true sales load was supposedly hidden by way of a "double escrow." Acquisitions acquired the Property in the first escrow, then sold it to plaintiffs in the second escrow. The purchase agreement represented that plaintiffs would each be responsible for only $3,500 in closing costs in connection with this second escrow. This disclosure about the closing costs at the second closing misled plaintiffs about the other components of the sales load they were actually paying.

A lender foreclosed on the Property on an unspecified date and the plaintiffs' investment was lost. Plaintiffs allegedly discovered wrongdoing by defendants in September 2012 (just before the filing of the initial complaint in November 2012). The discovery occurred at this time because "experts in taxation and accounting reviewed the record related to the discharge of indebtedness issue presented only by the foreclosure." Prior to this, plaintiffs "held no suspicion as to a possible fraud because they received the described interest in the [P]roperty, the represented cash flow and thought they had received the [Internal Revenue Code] Section 1031 benefit of deferred capital gain taxes. Plaintiffs had no cause to review the bona fides of [the] Section 1031 deferred capital gains vehicle until the Property was foreclosed upon *and* plaintiffs sought counsel for the negative implications of the tax reporting for a discharge of indebtedness for the tax year of the foreclosure . . . ."

5

*Information Disclosed to Plaintiffs at Time of Investment*

Among other challenges to the third amended complaint, respondents advanced a statute of limitations defense in their demurrers, based on the contention that written disclosures provided to plaintiffs at the time of their investment (in particular, the private placement memorandum) put plaintiffs on notice of the sales load and riskiness of the investment.

The first page of the private placement memorandum set forth the highlights of the investment offering. Acquisitions expected to purchase the Property from its prior owners for "$11,600,000, plus closing costs, financing costs, and related transactional costs." Acquisitions offered investors the opportunity to purchase tenancy-in-common ownership interests in the Property. A 1 percent interest consisted of $50,500 of equity (i.e., cash), paired with a $81,200 share of debt. The maximum offering amount was $5,050,000 of equity and $8,120,000 of debt (in the form of a nonrecourse loan to be obtained by Acquisitions).

Obviously, the "Investment Cost" ($13,170,000 — $5,050,000 equity plus $8,120,000 debt) to be collected by defendants exceeded the purchase price of the Property ($11,600,000). The first page of the summary of offering terms in the private placement memorandum stated, "The Investment Cost consists of the purchase price of $11,600,000 payable to the seller plus the costs described herein, including: (i) the Acquisition Fee of $505,000 payable to Acquisitions for identifying and analyzing the Property, negotiating the contract to purchase the Property and assigning the purchase contract to the Purchasers; (ii) selling commissions and due diligence allowances; (iii) organizational and offering expenses; (iv) loan costs and fees payable to the Lender; (v) closing costs . . . ; (vi) working capital reserves . . . ; and (vii) $300,000 in reserves which Acquisitions expects the Lender will withhold from Loan proceeds."

The private placement memorandum also included a detailed chart setting forth the estimated use of investment proceeds, including a scenario in which the full

$5,050,000 of "equity" was raised (as happened here).[4]  In this scenario:  $3,780,000 (74.9 percent) would be used as a down payment on the Property;[5] $505,000 (10 percent) would be used to pay an acquisition fee to Acquisitions; $353,500 (7 percent) would be used to pay selling commissions; $138,800 (2.7 percent) would be held in reserve; $126,250 (2.5 percent) would be used to pay loan fees, loan costs, and closing costs; $95,950 (1.9 percent) would be used for organization and offering expenses; and $50,500 (1 percent) would be allocated for marketing and due diligence expenses.

The chart did not, however, classify all of the expenses the same way. Three categories of expenses (amounting to 9.9 percent) were subtracted from the gross offering proceeds of $5,050,000, resulting in a line item (labeled "Available for Investment") of $4,550,050.  Below this line, the remaining fees and expenses were accounted for, including the down payment on the Property and the $505,000 fee paid to Acquisitions.  A footnote to the chart, emphasized by plaintiffs at oral argument, stated: "Acquisitions will receive an Acquisition Fee of $505,000 (based on the Maximum Offering Amount) for identifying and analyzing the Property, negotiating the contract to purchase the Property, and assigning the contract to the Purchasers. . . .  Acquisitions will defer any unpaid portion of the Acquisition Fee if the Maximum Offering Amount is not raised.  *Therefore, the value of the Property and the related proceeds to be raised in this offering should be considered increased by this additional cost*."  (Italics added.)

In the section of the private placement memorandum discussing risk factors, the following disclosure was made:  "Acquisitions intends to purchase the Property for $11,600,000, plus closing costs, financing costs, and related transactional and offering costs. . . .  The purchase price for the [investments] is determined

---

[4]    We include a copy of this chart as an appendix to this opinion.

[5]    The $3,780,000 down payment, paired with the $8,120,000 loan, equals $11,900,000 (the $11.6 million purchase price, plus the $300,000 lender reserve mentioned above).

7

unilaterally by Acquisitions and [a related company]. The purchase price likely does not reflect the current market value of the Property and is not based on an arms length negotiation with the [investors] or supported by an appraisal of the Property. In fact, the total purchase price for the [investments] will be significantly higher than the price to be paid by Acquisitions in its acquisition of the Property from the Seller. Based on the foregoing, the [investors] should not, therefore, anticipate or expect that the price paid for their investment is reflective of the fair market value of the Property on a stand-alone basis. The [investors] are, however, acquiring their [investments] based on the existence of the financing and the Management Agreement and the management expertise provided thereunder by the Property Manager. Nevertheless, there is no evidence that such additional rights support the increase in the purchase price."

By signing their purchase agreements, plaintiffs acknowledged their receipt and review of the confidential private placement memorandum, which made clear the investment was only being offered to accredited investors. The confidential private placement memorandum repeatedly warned potential investors about the risks inherent to an investment in the Property. We quote a few representative examples. "**THE INTERESTS AND INVESTOR UNITS OFFERED HEREBY ARE HIGHLY SPECULATIVE. AN INVESTMENT IN THE INTERESTS OR INVESTOR UNITS INVOLVES SUBSTANTIAL INVESTMENT AND TAX RISKS." "THE PURCHASE OF INTERESTS AND INVESTOR UNITS INVOLVES SIGNIFICANT RISKS. INVESTORS MUST READ AND CAREFULLY CONSIDER THE DISCUSSION SET FORTH BELOW IN 'RISK FACTORS.'" "PURCHASE OF THE INTERESTS AND INVESTOR UNITS IS SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT."**

8

DISCUSSION

The court sustained the demurrers at issue on statute of limitations grounds. Our de novo review of the orders "is limited to issues which have been adequately raised and supported in [appellants' opening] brief." (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6; see *McGettigan v. Bay Area Rapid Transit Dist.* (1997) 57 Cal.App.4th 1011, 1016, fn. 4.)

Applicable California statutes of limitations in this case range from one to four years. (See Code Civ. Proc., §§ 338, subds. (c) [conversion, three years], (d) [fraud, three years], 340.6 [action against attorney, one year after discovery or four year limit], 343 [claim not provided for, including nonfraudulent breach of fiduciary duty, four years].) To the extent they might apply, Arizona statutes of limitations are within the same range. (See Ariz. Rev. Stat. § 12-543 [three years, fraud]; *Mohave Elec. Coop. v. Byers* (Ariz.Ct.App. 1997) 189 Ariz. 292, 310 [two years, breach of fiduciary duty].) Plaintiffs' briefs do not identify the applicable statutes of limitations or contest the notion that the longest potentially applicable statute of limitations in this case is four years.

Plaintiffs purchased their interests in the Property in late 2005 to early 2006. The initial complaint was not filed until November 2012. The only argument plaintiffs make on appeal is that the court should have applied the delayed discovery rule to postpone accrual of the statute of limitations. "By their reliance on the 'discovery rule,' plaintiffs concede by implication that, without it, their claims are barred by one or more statutes of limitations." (*McKelvey v. Boeing North American, Inc.* (1999) 74 Cal.App.4th 151, 160, superseded by statute on other grounds as stated in *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 637, fn. 8.) Unless the discovery rule applies, the statute of limitations began running when plaintiffs made what they now deem to be unsuitable investments, paid what they now deem to be an unreasonable (and undisclosed) "sales load," and had in their possession documents disclosing the

9

downsides of the investment (e.g., the risks of the investment and the expenses beyond the acquisition price of the Property). As stated in their reply brief, plaintiffs "do not argue that an injury was not suffered when [they] made their investment."[6]

"An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.) "The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action." (*Ibid.*) A plaintiff relying on the discovery rule must plead "'(1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.'" (*Id*. at p. 808.) Plaintiffs have an obligation to plead facts demonstrating reasonable diligence. (*Ibid.* ["'conclusory allegations will not withstand demurrer'"].)

"Where a fiduciary obligation is present, the courts have recognized a postponement of the accrual of the cause of action until the beneficiary has knowledge or notice of the act constituting a breach of fidelity. [Citations.] The existence of a trust relationship limits the duty of inquiry. 'Thus, when a potential plaintiff is in a fiduciary relationship with another individual, that plantiff's burden of discovery is reduced and he is entitled to rely on the statements and advice provided by the fiduciary.'" (*Eisenbaum v. Western Energy Resources, Inc.* (1990) 218 Cal.App.3d 314, 324.) But, even assuming for the sake of argument that each of the respondents had a fiduciary duty to plaintiffs,

---

[6] Receipt of investment disclosures can trigger the statute of limitations in appropriate cases. (See, e.g., *Dodds v. Cigna Securities Inc.* (2d Cir. 1993) 12 F.3d 346, 347 ["when an investor is provided prospectuses that disclose that certain investments are risky and illiquid, she is on notice for purposes of triggering the statute of limitations that several such investments might be inappropriate in a conservative portfolio"]; *Calvi v. Prudential Secs.* (C.D.Cal. 1994) 861 F.Supp. 69, 71 ["the statute of limitations begins to run when a plaintiff should have discovered the alleged fraud, and . . . the receipt of a prospectus disclosing risks puts a plaintiff on notice of any misrepresentations or fraud concerning those risks"].)

10

this does not mean that plaintiffs had no duty of inquiry if they were put on notice of a breach of such duty. (See *Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 874-875.)

Plaintiffs argue the statute of limitations only began running when they consulted with tax and accounting experts in September 2012. The problem with this position is that the private placement memorandum provided to plaintiffs prior to their investments clearly disclosed the fees, expenses, and commissions that would be paid out of their cash investments, as well as the risky nature of the investments. These were illiquid, unregistered securities, which were only made available to accredited investors. Reasonable diligence in such circumstances does not consist of ignoring a private placement memorandum received prior to making an investment. (See *Casualty Ins. Co. v. Rees Investment Co.* (1971) 14 Cal.App.3d 716, 719-720 [tenant plaintiff failed to plead reasonable diligence in discovering unfair terms of lease in its possession]; *Marlow v. Gold* (S.D.N.Y., June 13, 1991, No. 89 Civ. 8589) 1991 U.S.Dist. Lexis 8106, p. *27 ["plaintiff abrogated his duty of inquiry of reasonable diligence by recklessly failing to familiarize himself with the prospectus"].) This is not a case in which the plaintiff "possessed no factual basis for suspicion." (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1326.) The information and disclosures in the private placement memorandum put plaintiffs on notice of the falsity of any communications they may have received about the sales load, tax advantages, or risk-free nature of the investments. The delayed discovery rule does not apply.

According to plaintiffs, there is an issue of fact as to whether they were on notice of the full sales load because of potentially misleading disclosures in the private placement memorandum.[7] For instance, the chart in the private placement memorandum

---

[7] The case law cited by plaintiffs on this point (e.g., *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 249) addresses the question of whether parties sufficiently pleaded fraud. Plaintiffs do not cite authority holding that parties who ignore or misunderstand written warnings and thorough (if complex) disclosures in their possession may thereby delay the accrual of the statute of limitations.

11

estimating the use of investment proceeds does not classify the $505,000 fee paid to Acquisitions as a cost to investors in the same way as selling commissions or organization and offering expenses. And the footnote emphasized by plaintiffs can arguably be read to suggest that the $505,000 fee somehow *increased* the value of the Property, though this potential implication was specifically disclaimed elsewhere in the private placement memorandum. But it cannot be denied that the entire sales load, including the $505,000 fee, was disclosed to plaintiffs in the private placement memorandum. The payment of these fees was the alleged harm suffered by plaintiffs. One can certainly question, particularly in retrospect, the value of the services provided by Acquisitions and the reasonableness of the total sales load. But the only issue here is whether plaintiffs were on notice of the total sales load and the risks of the investment. They were.

Plaintiffs also point out that they did not receive a clear explanation of the "sales load" for their specific investment (i.e., a dollar breakdown), or even an explanation of the "sales load" for each one percent investment share. But the disclosures made clear that the total investment costs significantly exceeded the expected costs of acquiring the Property and set forth the percentage of the cash raised from investors that would be used for various expenses. This was sufficient to put plaintiffs on notice that the "sales load" exceeded the capital gains tax rate. This is not akin to a situation in which a party relies on the statements of a fiduciary about, for instance, the legality of a complicated transaction. (*Eisenbaum v. Western Energy Resources, Inc.*, *supra*, 218 Cal.App.3d at pp. 320, 324-325.) Plaintiffs only needed the private placement memorandum and a calculator to obtain the information they now deem essential.

In sum, plaintiffs failed in their effort to plead the applicability of the delayed discovery rule. Moreover, we see no viable way for plaintiffs to adequately

12

plead the discovery rule.  The court correctly sustained respondents' demurrer to the third amended complaint without leave to amend.[8]

## DISPOSITION

The judgments are affirmed.  Hirschler Fleischer's request for judicial notice is denied.  Defendants shall recover costs incurred on appeal.


IKOLA, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


ARONSON, J.

---

[8] Each of the respondents' briefs includes arguments in the alternative for affirming the judgments.  As we agree with the court's stated reason for sustaining the respondents' demurrers, we need not address the respondents' backup arguments.

13

## ESTIMATED USE OF PROCEEDS

The following table sets forth certain information concerning the estimated use of proceeds of the Offering:

| | Minimum Offering | | Maximum Offering | |
|---|---|---|---|---|
| | Amount | Percentage of Gross Proceeds | Amount | Percentage of Gross Proceeds |
| Gross Offering Proceeds | $3,000,000 | 100.0% | $5,050,000 | 100.0% |
| Organization and Offering (1) | 57,000 | 1.9% | 95,950 | 1.9% |
| Selling Commissions (2) | 210,000 | 7.0% | 353,500 | 7.0% |
| Marketing and Due Diligence Allowance (3) | 30,000 | 1.0% | 50,500 | 1.0% |
| Available for Investment | $2,703,000 | 90.1% | $4,550,050 | 90.1% |
| Down Payment for Purchase of Real Estate (4) | 2,247,000 | 74.9% | 3,780,000 | 74.9% |
| Acquisition Fee (5) | 300,000 | 10.0% | 505,000 | 10.0% |
| Loan Fees, Loan Costs and Closing Costs (6) | 75,000 | 2.5% | 126,250 | 2.5% |
| Reserve (7) | 81,000 | 2.7% | 138,800 | 2.7% |
| Proceeds Utilized | 2,703,000 | 90.1% | 4,550,050 | 90.1% |
| Offering and Organization Expenses and Fees | 297,000 | 9.9% | 499,950 | 9.9% |
| Total Application (8) | $3,000,000 | 100.0% | $5,050,000 | 100.0% |