Filed 6/23/16  ARI-PFOP 1 v. Hirschler Fleischer CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ARI-PFOP 1, LLC, et al., | |
| Plaintiffs and Appellants, | G050857 |
| v. | (Super. Ct. No. 30-2012-00552486) |
| HIRSCHLER FLEISCHER, ACP et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from judgments of the Superior Court of Orange County, Gail Andrea Andler, Judge.  Affirmed.

Catanzarite Law Corporation, Kenneth J. Catanzarite, Nicole M. Catanzarite-Woodward and Eric V. Anderton for Plaintiffs and Appellants.

LINER, Maribeth Annaguey and Kathryn L. McCann for Defendant and Respondent CBRE, Inc.

Brown Rudnick and Joel S. Miliband; Berkowitz Oliver Williams Shaw & Eisenbrant, Anthony J. Durone and Jennifer B. Wieland for Defendant and Respondent Burch & Company, Inc.

Skadden, Arps, Slate, Meagher & Flom, Peter B. Morrison and Kevin J. Minnick for Defendant and Respondent LaSalle Bank, N.A.

Lester & Cantrell, Mark S. Lester, David Cantrell and Colin A. Northcutt for Defendant and Respondent Hirschler Fleischer, APC.

\* \* \*

In March 2014, Judge Gail Andler entered rulings on 49 motions made in eight different superior court cases in a single minute order. She explained all the motions were filed in "what has become known as the 'ARI' group of cases." Judge Andler stated, "As with the prior rounds of challenges to the pleadings, since the motions raise issues and arguments common to all cases, the court will reflect the rulings . . . on a single [m]inute [o]rder to be placed in each individual case file."

This appeal arises out of judgments entered in what Judge Andler referred to as "Case 2," following the sustaining of four separate demurrers to the second amended (operative) complaint (SAC) without leave to amend. The 10 appealing plaintiffs are all Delaware limited liability companies (ARI-PFOP 1, LLC; ARI-PFOP 3, LLC; ARI-PFOP 19, LLC; ARI-PFOP 25, LLC; ARI-PFOP 28, LLC; ARI-PFOP 32, LLC; ARI-PFOP 33, LLC; ARI-PFOP 34, LLC; ARI-PFOP 39, LLC; ARI-PFOP 40, LLC). For convenience and clarity in this opinion we will refer to the appealing ARI-PFOP entities collectively as Plaintiffs. We affirm the four judgments of dismissal at issue in this appeal based on our conclusion the applicable statute of limitations bars recovery.

2

PROCEDURAL HISTORY

The case concerns Plaintiffs' failed multi-million dollar investment in commercial real estate. In 2005 and 2006, Plaintiffs invested in three office buildings known as Powers Ferry Landing East in Atlanta, Georgia (the Property). The transaction was promoted by ARI-PFOP, LLC (the Company), and its related entities and affiliates, referred to collectively by the parties as the "ARGUS Defendants."[1]

The purchases were part of an Internal Revenue Code section 1031 exchange, which allowed Plaintiffs to defer capital gains taxes on the sale of other real estate assets they owned. However, all did not proceed as planned and the investment property was foreclosed upon and sold in 2011.

In 2012, Plaintiffs (in a class action complaint) sued 30 defendants but only four, on the periphery of the transaction, are involved in this appeal after the court sustained their demurrers and entered judgments of dismissal. The four defendants are real estate broker CBRE, Inc., securities broker and dealer, Burch & Company (Burch), LaSalle Bank, N.A. (LaSalle), and the law firm Hirschler Fleischer (Hirschler). For convenience and the sake of clarity these four entities will be referred to collectively as Defendants, unless the context requires otherwise.

Plaintiffs amended their complaint several times in response to motion practice by the Defendants.[2] The operative SAC alleges 17 causes of action and groups

---

[1] The trial court sustained the ARGUS Defendants' demurrer, however, these entities are not parties to this appeal.

[2] The court sustained demurrers to the original complaint without leave to amend on Plaintiffs' claims for disgorgement and unfair business practices under Business and Professions Code section 17200. Because Plaintiffs do not appeal from the court's dismissal of their accounting and disgorgement claims they are not mentioned in this opinion. The court granted Plaintiffs leave to amend the other causes of action. The court rejected the first amended complaint (FAC) on procedural grounds, and thereafter, the Plaintiffs filed the SAC which is identical in substance to the FAC.

3

the Defendants into three categories. First, there are seven groups titled "Class Defendants" because they are named by the "Class Plaintiffs." Second, there are "Non-Class Defendants" subject to individual claims. Third, there are "Doe Defendants." This appeal concerns only four "Class Defendants," namely, CBRE, LaSalle, Burch, and Hirschler. For purposes of this appeal, the causes of action against these Defendants can be boiled down to the breach of various fiduciary duties, intentional misrepresentation, and fraud claims. In addition, there is a legal malpractice claim against Hirschler.

The trial court sustained Defendants' demurrers to the SAC, without leave to amend, in part, on the basis that all causes of action were barred by the applicable statute of limitations. In the minute order, Judge Andler commented, "It is an understatement to say that much time and effort has been spent by counsel and the court discussing these pleadings, in some cases for years, in order to determine if a pleading could be crafted which could survive a challenge. Each version of each complaint generated demurrers and motions to strike. Although recognizing the valid concerns expressed by a number of defendants, leave to amend was previously granted in recognition of the great liberality the law provides for amending pleadings. There were specific discussions as to what the concerns were, and counsel for plaintiffs had asserted, at oral argument, that the deficiencies could and would be cured. . . . [P]laintiffs were put on notice as to the need to plead with greater specificity regarding the roles played by each of the defendants and their alleged acts or omissions. [¶] The court previously commented that plaintiffs appear in some of the pleadings to simply sue anyone and everyone who had anything to do with the transactions, regardless of how remote the participation of some of the defendants might be."

The trial court stated that in addition to sustaining the demurrers on statute of limitations grounds, the court also considered and ruled on causes of action for alternative grounds alleged by Defendants. For example, the court determined some of the fraud-based causes of action failed because Plaintiffs "still plead elements of . . . each

4

cause of action in general terms-identifying the alleged responsible defendant by group, and failing to plead each element with specific facts.  It strains credibility to believe that none of the plaintiffs have any recall or records on which to rely in sufficiently pleading these causes of action, given the nature of these transactions and the amount of money involved."  Judge Andler added the aiding and abetting allegations fail because Plaintiffs failed to allege facts "that said defendants had 'actual knowledge' that the directly liable defendant intended to commit 'a specific wrongful act' and that said defendants gave substantial assistance to the directly liable defendant."  The court repeated the pleadings were defective because, despite "having been previously admonished" by the court, Plaintiffs "have continued to use 'group pleading' for apparently related entities . . . and the parties must be able to differentiate the specific roles, acts and omissions alleged as to each defendant 'lumped together' in the group allegations."  (Emphasis omitted.)

Plaintiffs challenge this ruling on appeal, maintaining they timely filed their complaint and adequately complied with the delayed discovery rule.  We recognize the trial court's ruling was made after it took judicial notice of the parties' Private Placement Memorandum (PPM), and for purposes of this appeal, we granted Hirschler's motion for judicial notice of the same applicable PPM.

FACTS

"In conducting our de novo review, we 'must "give[ ] the complaint a reasonable interpretation, and treat[ ] the demurrer as admitting all material facts properly pleaded."  [Citation.]  Because only factual allegations are considered on demurrer, we must disregard any "contentions, deductions or conclusions of fact or law alleged . . . ."'  [Citation.]"  (*WA Southwest 2, LLC v. First American Title Ins. Co.* (2015) 240 Cal.App.4th 148, 151 (*WA Southwest*).)

5

*The Allegations of Wrongdoing*

The pertinent facts are alleged in Plaintiffs' pleadings and the PPM. In the SAC, Plaintiffs seek the return of their investment money on the grounds they would not have invested in the Property had they known the total up-front costs, or "Sales Loads," actually exceeded the 15 percent capital gains tax they sought to defer by making the investment. Specifically, they allege there was an undisclosed $1,306,000 mark up in the purchase price. They complain, "The transaction was nothing more than a real estate scam put together by [Defendants] to line their own pockets."

The PPM disclosed the Company was "formed to acquire and operate all of, or an undivided interest in," the Property. It stated one of the ARGUS Defendants, ARI-Powers Ferry Office Park, LLC (ARI) would first purchase the property from a third party seller for $66,606,000 using a $50 million loan from LaSalle. ARI's affiliate, ARI Commercial Properties, Inc. (ARICP), acted as the real estate broker (and is listed as one of the ARGUS Defendants).

Plaintiffs alleged the ARGUS Defendants used a PPM and marketing materials to offer two types of "'Securities'" in the "'Offering.'" Using cash from a prior sale of real property, investors could purchase either tenancy in common (TIC) interests or LLC membership interests. The Offering required the help of several interrelated ARGUS Defendants.[3]

---

[3] ARI was the managing member of the Company, and these entities were affiliated with several other ARGUS Defendants. As previously mentioned, ARICP was a real estate broker and later served as a property manager of the Property. ARI-PFOP Mezzanine, LLC was formed to provide mezzanine financing to ARI and the Company. Argus Realty Investors, L.P. was the managing member of General Partner (Managing Member). Argus Realty, LLC (Argus Realty) was the general partner of Managing Member and sponsored ARI's sale of the TIC interests. Also included within the grouping of ARGUS Defendants were several individuals who managed and ran the various entities (Richard Gee, Maxwell Drever, Timothy Snodgrass, Harris Totakhail, Joseph Corpal, and David Wong).

Plaintiffs alleged their class action included persons who purchased securities as membership interests in the Company and "Special Purpose Entities" (SPEs) organized by Defendants under the names ARI-PFOP 1, LLC through ARI-PFOP 40, LLC and each of these entities acquired separate TIC interests. Of the 40 SEPs who purchased TIC interests, 10 are appealing.

In their complaint, Plaintiffs stated, "The ARGUS Defendants orchestrated a scheme whereby the Property was placed under contract by straw-buyer ARI, a newly organized company with nominal capital and unable to close the purchase. In a simultaneous closing [the Plaintiffs] provided virtually all of the down payment funds which combined with the purchase money bank loan from [LaSalle], allowed the Property closing to occur. . . . The [Plaintiffs] were deceived through the use of double escrows which made it appear ARI was selling them the TIC [i]nterests in the Property when in fact they were direct purchasers providing virtually all of the funds to close the deal. Thereafter, over a roughly seventy-five day period, ARI would sell the remainder of the [p]roperty ownership to those members of the [c]lass who could purchase TIC [i]nterests post-closing of the Property, thereby pocketing those funds as well."

Plaintiffs alleged the ARGUS Defendants and their counsel, Hirschler, prepared and distributed the PPM and marketing materials through Burch, the lead underwriter and managing broker-dealer, who in turn distributed the PPM to investors through a group of "soliciting broker-dealers." They asserted CBRE "appeared to act initially only as the seller's real estate agent in the purchase of the Property" but CBRE knew the purchase price was illegally marked up and it had a duty to disclose the scheme to Plaintiffs. They alleged CBRE also had a duty to disclose because it agreed, prior to closing, to act as the buyers' leasing agent post-closing.

Plaintiffs asserted the PPM represented the property's purchase price "was the same as that which had been negotiated with the unrelated seller who was paying the commission" to ARICP. Plaintiffs stated they were led to believe the "price had been

7

agreed upon that had the unrelated seller paying the commission to [ARICP] not [Plaintiffs]." They alleged Defendants "participated in marking up the purchase price to hide the true facts that both [ARICP] and CBRE were receiving commissions described as paid by the Property seller when the truth was the unknowing [Plaintiffs] were paying the buyers' commission as a hidden 'Sales Load' (as described below)."

Plaintiffs maintained they funded the entire down payment to acquire the Property and then ARI claimed "to have purchased the Property for the commission-grossed-up price of $66,606,000 (the 'Purchase Price') (grossed up by at least $1,306,000 commission paid to [ARICP], the 'Markup') at 'Closing.'" Plaintiffs alleged "the true costs and true purchase price of the Property was concealed through the use of double blind escrows where the [Plaintiffs] were falsely led to believe that ARI had acquired the Property and sold it to them when in fact they provided virtually all the required funds."

The SAC discussed several misrepresentations and non-disclosures. Plaintiffs alleged ARI and the Company raised $74 million and represented the "'Sales Loads', the amount disclosed as the cost to offer real estate Securities including securities sales commissions, fees and costs, to be a total of $2,670,000 or 11.1 [percent] of the Gross Offering Proceeds of [$74 million]."

Plaintiffs stated that had they known the Sales Loads would be 16.5 percent, which is greater than capital gains taxes, they would not have purchased the Securities.[4] In addition to the misrepresented Sales Loads, Plaintiffs questioned the amount of loan fees payable to ARICP, the need for carrying costs to pay expenses on a mezzanine loan, and complained the PPM falsely promised a suitability review of all TIC investors. Plaintiffs did not allege the loan fees or suitability review were material to their decision to make the investment.

---

[4] Plaintiffs calculate this figure as follows: $1,306,000 of the $24 million maximum equity contribution is 5.4 percent. The PPM disclosed a Sales Load of 11.1 percent, but with the additional 5.4 percent, the Sales Load increased to 16.5 percent.

8

*Information Disclosed at Time of Investment in the PPM*

It was anticipated the Company would raise funds pursuant to the terms described in PPM and purchase some or all of the property from ARI. The PPM stated ARI would sell an "undivided interest in the Property to the Company at the price (determined on a pro rata basis) paid by ARI for the Property plus the Company's share of transfer and due diligence expenses, carrying costs attributable to funds advanced . . . to acquire the Property, and other fees and expenses incurred in the acquisition and financing of the Property."

Under the PPM, the Company offered TIC and LLC interests in the Property as set forth in the memorandum and addendum. It explained, "For the purposes of this investment, the price of a Unit includes not only a percentage of the purchase price for the Property but also a percentage of (i) the Selling Commissions and Expenses (as set forth in the ESTIMATED USE OF PROCEEDS below), (ii) *a real estate brokerage commissions of $1,306,000 paid to . . . an affiliate of ARI*, and (iii) a promotional fee of $710,000 paid to ARI." (Italics added.)

The "ESTIMATED USE OF PROCEEDS" is a detailed chart setting forth the estimated use of the $24 million investment proceeds raised from TIC investors. The chart did not classify the expenses the same way. Four categories of expenses (amounting to 11.1 percent) were subtracted from the gross offering proceeds of $24 million, resulting in a line item labeled "Available for Investment" of $21,330,000. Thus, in the scenario in which the full amount of equity was raised as follows:

$1,800,000 (7.5 percent) would be used to pay "Selling Commissions";

$480,000 (2 percent) would be held for a "Marketing Allowance";

$240,000 (1 percent) would be for a "Due Diligence Allowance and Placement Fee"; and

$150,000 (0.6 percent) would be used to pay "Offering and Organization Expenses." Three of these itemized expenses have a corresponding footnote containing further explanations, which we will discuss anon.

After these sums were subtracted from the gross offering proceeds, and below the line item of money "Available for Investment," the chart lists the remaining six accounted for expenses. The first expense, titled, "Down Payment-Purchase of Property" (81.7 percent) is followed by a list of five sub-categories relating to the down payment (totaling 7.2 percent). Footnote number 3, inserted next to the "Down Payment" category advised that in addition to the down payment, ARI "anticipates obtaining" a loan and ARI would receive a promotional fee of $710,000 "for its role in the Offering." This helps explain why directly under the line item "Down Payment" there are five expenses related to taking out a loan, including loan fees, loan costs, lender legal fees, carrying costs, and closing costs. The estimated amounts for these expenses were as follows:

$19,606,000 (81.7 percent) would be used as a down payment on the Property;

$710,000 (3 percent) would be used to pay the "Promotional Fee";

$500,000 (2.1 percent) would be used to pay loan fees and costs;

$250,000 (1 percent) would be used to pay estimated carrying costs;

$224,000 (0.9 percent) would be used to pay the estimated closing costs; and

$40,000 (0.2 percent) would be used to pay lender legal fees. Five of these expenses have a corresponding footnote containing further explanations, which we will discuss anon.

Relevant to this case, the ESTIMATED USE OF PROCEEDS's chart is on the same page as, and immediately above, a paragraph describing the buyer's obligation to pay a $1,306,000 real estate brokerage commission (the ARICP Paragraph). Plaintiffs'

maintain this $1,306,000 was a hidden fee used to gross up the purchase price. They believed the PPM promised this fee was the seller's obligation.

The ARICP Paragraph begins with the statement ARICP "will receive $1,306,000 from the [s]eller as a real estate brokerage commission on the purchase of the Property." The second sentence clarifies, "Commissions are normally paid by the seller rather than the buyer. However, *the purchase price will generally be adjusted upward to take into account this obligation* of the [s]eller so that in effect the [TICs], including the Company, as the buyers, will collectively bear all of this real estate brokerage commission in the purchase price of the Property. The [TICs], including the Company, *also expect to pay commissions* in connection with the sale of the Property, which will reduce the net proceeds to the [TICs], including the Company, of any such sale." (Italics added.) In short, the TIC investors were warned they would be responsible for paying a portion of the seller's broker's commission ($1,306,000) *in addition to* other commissions earned during the sale of the Property.

The $1,306,000 commission is not separately listed on the ESTIMATED USE OF PROCEEDS chart of expenses, however, there was listed an estimated $1,800,000 in "Selling Commissions." It is unclear from the chart whether ARICP's $1,306,000 commission is included within this larger sum of "Selling Commissions."

The PPM contained additional information regarding commissions and further defined "Selling Commissions and Expenses." For example, footnote 2, typed next to "Selling Commissions" explained the nature of the expenses listed below it. Footnote 2 stated, ARI "may accept subscriptions for Units and Interests net of all or a portion of the Selling Commissions otherwise payable as described under DISTRIBUTION PLAN below . . . ." This sentence is difficult to understand without also reviewing the DISTRIBUTION PLAN (the Distribution Plan), found on page 85 of the 115 page PPM.

11

The Distribution Plan portion of the PPM stated the $24 million Offering is for a maximum of 1,000 Units ($24,000 per Unit.). The Distribution Plan next explained how the Company intended to distribute the *net proceeds* from the sale of each Unit "to the Company's capital." It defined the $24 million cash collected during the Offering as *gross proceeds*. It was anticipated the Company would be capitalized with net proceeds, calculated by subtracting "Offering and Organization Expenses and Selling Commissions and Expenses" from the gross proceeds.

These two terms ("Offering and Organization Expenses" and "Selling Commissions and Expenses") were defined elsewhere in the PPM. Footnote 1 of the chart explained the "Offering and Organization Expenses" represented a reimbursement of funds owed to "the Manager," also known as ARI. Footnote 2 and the Distribution Plan read together explain the "Selling Commissions and Expenses" would not exceed 10.5 percent of the gross proceeds of the Offering and would be paid to both the "Broker-Dealers" and "the Managing Broker-Dealer."

Specifically, the Distribution Plan anticipated "Broker-Dealers (collectively the 'Selling Group')" would offer and sell the units to qualified investors to raise the cash needed for capitalization. The Managing Broker-Dealer would supervise and coordinate the Selling Group members, who "will receive Selling Commissions of up to 7.5 [percent] of the gross proceeds of the Offering." The Managing Broker-Dealer can also receive a 2 percent "nonaccountable marketing allowance," plus a 0.5 percent "nonaccountable due diligence allowance" and a 0.5 percent "placement fee." Therefore, the Managing Broker-Dealer and Selling Groups were owed "Selling Commissions and Expenses" comprised of "Selling Commissions," a placement fee, a marketing allowance, and a due diligence allowance totaling (and not to exceed) 10.5 percent.

As mentioned earlier, the ESTIMATED USE OF PROCEEDS chart did not classify all the expenses the same way and listed four expenses (amounting to 11.1 percent) that were subtracted first from the gross offering proceeds of $24 million,

12

resulting in a line item labeled "Available for Investment" of $21,330,000.  After reviewing the footnotes and the Distribution Plan, it becomes apparent these four expenses (totaling 11.1 percent) refer specifically to the "Offering and Organization Expenses and Selling Commissions and Expenses" as defined in footnotes 1 and 2 and the Distribution Plan.  These expenses are classified differently than the others because it was anticipated the Company could only be capitalized with *net proceeds* from the Offering (calculated by subtracting from the gross proceeds the "Selling Commissions," which included a placement fee, a marketing allowance, and a due diligence allowance, plus the "Offering and Organization Expenses."  Thus, 11.1 percent was subtracted first from the $24 million representing gross proceeds.  The second grouping of expenses (the down payment, loan costs, and promotional fees) were listed separately.

In summary, the ESTIMATED USE OF PROCEEDS chart, the ARICP paragraph, and various footnotes revealed a potential "Selling Commission" of $1,800,000 in the category of expenses used to calculate net proceeds to capitalize the Company.  We recognize it is unclear whether ARICP's $1,306,000 brokerage commission was included as part of this category of expense or was intended to be a separate and additional obligation.  There is no evidence the investors were told one way or the other.  However, what is plainly clear is the PPM disclosed to Plaintiffs their obligation to pay a Selling Commission *and* ARICP's commission.

The PPM also warned "***The purchase price to be paid by investors for the Interests and Units exceeds the appraised value of the Property.***  ARI intends to purchase the Property for $66,606,000 . . . plus additional carrying costs, due diligence expenses, and other fees and expenses incurred in the acquisition and financing of the Property. . . . ARI and the Company intend to acquire proceeds from the sale of all of the Interests and the Units, together with the Loan, equal to $74,000,000.  The purchase price for the Units and Interests is determined unilaterally by ARI and the Company and likely does not reflect the current market value of the Property, and is not based on an arm's

13

length negotiation with the Purchasers or Members or supported by an appraisal of the property. In fact, the total purchase price . . . will be significantly higher than the purchase price to be paid by ARI in its acquisition of the Property." In summary, the PPM revealed the sale price was being marked up to cover other fees and costs.

And finally, simple arithmetic shows the investment totaled $74 million ($24 million equity from investors plus a $50 million bank loan), which far exceeded the reported purchase price of the property ($66,606,000). Additionally, the PPM contained multiple risk warnings, in bold italicized print, that the venture was "highly speculative and involve[d] substantial risks." Investors were advised to consult their own legal and tax advisors "to ascertain the merits and risks of an investment in the Units before investing." The PPM also warned in bold type, "This Memorandum contains forward-looking statements that involve risks and uncertainties. The Company's results may differ significantly from those disclosed in this Memorandum." (Bold emphasis omitted.)

DISCUSSION

*1. Standard of Review*

A demurrer is used to test the sufficiency of the factual allegations of the complaint to state a cause of action. (Code Civ. Proc., § 430.10, subd. (e).) The facts pled are assumed to be true and the only issue is whether they are legally sufficient to state a cause of action. "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its

14

discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

Moreover, "As a general rule in testing a pleading against a demurrer the facts alleged in the pleading are deemed to be true, however improbable they may be. [Citation.] The courts, however, will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604.)

*2. Applicable Statutes of Limitations & Delayed Discovery Rule*

The gravamen of Plaintiffs' complaint is they overpaid for the Property because the purchase price was bumped up to extract additional fees. Plaintiffs claim they would not have invested if they knew the "Sales Loads" (i.e., the fees, expenses, and commissions paid) exceeded the capital gains tax rate of 15 percent. In their demurrers, Defendants argued the applicable statute of limitations barred all claims. On appeal, the parties agree the applicable statute of limitations was three years. (Code Civ. Proc., § 338, subd. (d).) Plaintiffs purchased the property in 2005 and the initial complaint was not filed until 2012.

"Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' [Citations.] An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. [Citations.]" (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806-807.) "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.] Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period. [Citations.]"

15

(*Id.* at p. 807.)  "The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action."  (*Ibid.*)  "The discovery rule . . . allows accrual of the cause of action even if the plaintiff does not have reason to suspect the defendant's identity."  (*Ibid.*)

In their appeal, Plaintiffs argue the court should have applied the delayed discovery rule to toll the statute of limitations in their case.  "'By their reliance on the "discovery rule," [P]laintiffs concede by implication that, without it, their claims are barred by one or more statutes of limitations.'  [Citation.]  Unless the discovery rule applies, the statute of limitations began running when [P]laintiffs made what they now deem to be unsuitable investments, paid what they now deem to be an unreasonable (and undisclosed) 'sales load,' and had in their possession documents disclosing the downsides of the investment (e.g., the risks of the investment and the expenses beyond the acquisition price of the Property)."  (*WA Southwest, supra,* 240 Cal.App.4th at p. 156.)

"California law recognizes a general, rebuttable presumption, that Plaintiffs have 'knowledge of the wrongful cause of an injury.'  [Citation.]  In order to rebut that presumption, "'[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence."  [Citation.]  In assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to "show diligence"; "conclusory allegations will not withstand demurrer.'  [Citation.]"  (*Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 638.)

In their operative complaint, Plaintiffs denied knowledge of facts that would make them question the reliability of Defendants' representations regarding the TIC investments.  On appeal, Plaintiffs maintain the court erred in finding allegations of time, manner of discovery, and inability to have made an early discovery conclusory.

16

Plaintiffs assert they adequately alleged the time and manner of discovery in the SAC. The complaint alleged the fraud was not discovered by Plaintiffs until the TIC interests were "brought to counsel for consultation following the Medtronics' relocation representations" in a different real estate litigation case, referred to as the "'Shoreview Litigation'" involving the ARGUS Defendants. Plaintiffs alleged, "During counsel's investigation of Shoreview Property they discovered the seller-paid commission/purchase price mark-up fraud. The investigation led from one transaction to another until reaching [p]laintiffs here who requested in . . . 2012 that counsel review the offering documents in this case. . . ." Plaintiffs assert this allegation clearly states when and how they discovered the wrongdoing.

Plaintiffs also assert the court erroneously determined they did not allege the inability to discover the misconduct earlier despite reasonable diligence. In the SAC, Plaintiffs alleged they could not have with diligence discovered the fraud because they reasonably relied on the ARGUS Defendants' representations and marketing. They asserted that after the acquisition the ARGUS Defendants continued to provide services as a fiduciary to the Plaintiffs in the form of property management, leasing, accounting, and other property-related services.

*3. The WA Southwest Case*

After briefing was completed in this appeal, a different panel of this court published the *WA Southwest* case and we gave the parties an opportunity to submit letter briefs to discuss its relevance to this appeal. The case is essentially identical to the one before us now.

Both cases concern failed real estate investments in which investors sought to defer payment of capital gains taxes by investing in TIC interests in real property marketed by investment firms. (*WA Southwest, supra,* 240 Cal.App.4th at pp. 152-153.) In both cases, plaintiffs invested after receiving a PPM containing detailed disclosures and risk warnings. The cases involved deals whereby a company expected to purchase

17

property from a third party and then offer investors the opportunity to purchase TIC interests in the property. (*Id.* at p. 153.) And, in both cases, the investors lost their money and (represented by the same law firm) sued seemingly every entity or individual with any connection whatsoever to the investments, claiming they would not have invested had they known about hidden fees that increased the Sales Loads above the capital gains tax rate. (*Ibid.*) In our case, and in *WA Southwest*, the trial court sustained demurrers and entered judgment for certain defendants based on, among other things, the applicable statutes of limitations. (*Id.* at p. 150.)

In *WA Southwest*, the court affirmed the judgment of dismissal, holding that the plaintiffs were on inquiry notice of their injury at the time of their investments because of detailed disclosures in the PPM they received prior to investing. (*WA Southwest, supra,* 240 Cal.App.4th at pp. 157-158.) The disclosures in *WA Southwest* revealed that the negotiated purchase price of the property was $11.6 million, but $13,170,000 was being raised so that other expenses could also be paid, including a $505,000 fee payable to an investment organizer/promoter company. (*Id.* at pp. 153-154.) The disclosures did not suggest the seller of the property was paying the $505,000 fee or any of the other expenses making up the difference between the negotiated purchase price and the total investment cost. (*Ibid.*) Accordingly, the *WA Southwest* court rejected plaintiffs' theory they were not on notice the additional fees created a Sales Load greater than the capital gains tax rate they wanted to avoid.

Similarly, in this case the front page of the PPM plainly disclosed the price for one Unit (i.e., the investment cost) included "not only a percentage of the purchase price" but also a percentage of three additional costs, namely (1) selling commissions and expenses set forth in the table of ESTIMATED USE OF PROCEEDS, (2) $1,306,000 paid to ARICP for "real estate brokerage commission", and (3) $710,000 paid to ARI for a promotional fee. This disclosure did not suggest the seller was paying the $1,306,000 commission or the other anticipated additional expenses. The PPM's first page plainly

18

stated the investor was expected to pay a percentage of the purchase price *plus* a large promotional fee, a large brokerage commission, and "Selling Commissions and Expenses."

The investor's obligation to pay these three expenses in addition to the purchase price is repeated on page 11 of the PPM. As mentioned above, the ESTIMATED USE OF PROCEEDS chart contains two groupings of expenses (1) the expenses related to capitalization of the Company, and (2) the down payment expenses. The $710,000 promotional fee listed on the first page is specifically included as a stand-alone cost within the chart's second group of expenses (of down payment costs). The first page's reference to "Selling Commissions and Expenses" is one of the categories of expenses listed as part of the first group of expenses related to capitalization. The third expense listed on the first page, ARICP's $1,306,000 commission, is not specifically identified on the chart. However, a detailed description of this expense was included in paragraph directly beneath the chart, i.e., the ARICP Paragraph.

Plaintiffs focus on the first sentence of the ARICP Paragraph that states ARICP "will receive $1,306,000 from the [s]eller as a real estate brokerage commission on the purchase of the Property." However, the sentence cannot be viewed in a vacuum. The next sentence explains that the commission, "normally paid by the seller," will in fact be paid by the buyers, and the purchase price "*will generally be adjusted upward* to take into account this obligation of the [s]eller so that in effect the [TICs] . . . as the buyers, will collectively bear all of this real estate brokerage commission in the purchase price of the Property." (Italics added.) This paragraph confirms the statement made on the first page of the PPM that the buyers were obligated to pay the $1,306,000 and further explained the purchase price would be grossed up to cover this cost. The ARICP paragraph concludes, "The [TICs], including the Company, also expect to pay commissions in connection with the sale of the Property, which will reduce the net proceeds to the [TICs], including the Company, of any such sale." This last sentence

19

suggests the $1,306,000 would be in addition to the "Selling Commissions and Expenses" listed in the first group of costs in the ESTIMATED USE OF PROCEEDS chart. As mentioned, those selling commissions reduced the net proceeds related to capitalization of the company, i.e., the expense outlined in the Distribution Plan portion of the PPM.

In the *WA Southwest* case, the court rejected plaintiffs' argument the statute of limitations only began running when they consulted tax and accounting specialists six years after they made their investment, concluding this argument ignores the disclosures made in the PPM. It stated, "The problem with this position is that the private placement memorandum provided to plaintiffs prior to their investments clearly disclosed the fees, expenses, and commissions that would be paid out of their cash investments, as well as the risky nature of the investments. These were illiquid, unregistered securities, which were only made available to accredited investors. Reasonable diligence in such circumstances does not consist of ignoring a private placement memorandum received prior to making an investment. (See *Casualty Ins. Co. v. Rees Investment Co.* (1971) 14 Cal.App.3d 716, 719-720 [tenant plaintiff failed to plead reasonable diligence in discovering unfair terms of lease in its possession]; *Marlow v. Gold* (S.D.N.Y., June 13, 1991, No. 89 Civ. 8589 (JSM)) U.S.Dist. Lexis 8106, p. *27 ['plaintiff abrogated his duty of inquiry of reasonable diligence by recklessly failing to familiarize himself with the prospectus'].) This is not a case in which the plaintiff 'possessed no factual basis for suspicion.' (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1326.) The information and disclosures in the private placement memorandum put plaintiffs on notice of the falsity of any communications they may have received about the sales load, tax advantages, or risk-free nature of the investments. The delayed discovery rule does not apply." (*WA Southwest, supra,* 240 Cal.App.4th at p. 157.)

We agree with the *WA Southwest* case's discussion that the existence of alleged fiduciary relationships does not give Plaintiffs in this case a free pass with respect to the statute of limitations. "'Where a fiduciary obligation is present, the courts have

20

recognized a postponement of the accrual of the cause of action until the beneficiary has knowledge or notice of the act constituting a breach of fidelity. [Citations.] The existence of a trust relationship limits the duty of inquiry. "Thus, when a potential plaintiff is in a fiduciary relationship with another individual, that plaintiff's burden of discovery is reduced and he is entitled to rely on the statements and advice provided by the fiduciary."' [Citation.] But, even assuming for the sake of argument that each of the respondents had a fiduciary duty to plaintiffs, this does not mean that plaintiffs had no duty of inquiry if they were put on notice of a breach of such duty. [Citation.]" (*WA Southwest, supra,* 240 Cal.App.4th at p. 157.) As discussed earlier in this opinion, Plaintiffs relying on the discovery rule must plead ""the inability to have made earlier discovery despite reasonable diligence."' [Citation.] Plaintiffs have an obligation to plead facts [and no conclusory allegations] demonstrating reasonable diligence. [Citation.]" (*Ibid.*)

Also applicable to this case is the *WA Southwest* case's discussion that a potentially misleading disclosure in the PPM did not create an issue of fact as to whether Plaintiffs were on notice of the full Sales Loads. (*WA Southwest, supra,* 240 Cal.App.4th at p. 158.) In the *WA Southwest* case, the chart estimating the use of investment proceeds did not classify a $505,000 acquisition fee "as a cost to investors in the same way as selling commissions or organization and offering expenses." (*Ibid.*) The plaintiffs argued this separation could be read as increasing the value of the property, even though elsewhere in the PPM the item was described as an expense not an asset. The court disagreed, stating, "But it cannot be denied that the entire sales load, including the $505,000 fee, was disclosed to plaintiffs in the [PPM]. The payment of these fees was the alleged harm suffered by plaintiffs. One can certainly question, particularly in retrospect, the value of the services provided by [the entity receiving the acquisition fee] and the reasonableness of the total sales load. But the only issue here is whether

21

plaintiffs were on notice of the total sales load and the risks of the investment. They were." (*Ibid.*)

In our case, the $1,306,000 commission was not specifically classified anyplace on the ESTIMATED USE OF PROCEEDS chart, which supports Plaintiffs' theory it was arguably misleading how they should categorize this anticipated expense. And in hindsight, they question the validity of the commission. But as was the case in *WA Southwest,* it cannot be denied that the entire Sales Loads, including the $1,306,000 expense, was disclosed to Plaintiffs in the PPM. They were put on notice and cannot toll the statute of limitations by pleading delayed discovery.

As in the *WA Southwest* case, the PPM in this case disclosed a long list (spanning 18 pages) of "RISK FACTORS." One risk disclosed was that the purchase price paid by the investors exceeds the appraised value of the Property. The PPM explains ARI will purchase the property for "$66,606,000 . . . plus additional carrying costs, due diligence expenses, and other fees and expenses incurred in the acquisition and financing of the Property. . . . ARI and the Company intend to acquire proceeds . . . equal to $75,000,000. The purchase price . . . is determined unilaterally by ARI and the Company and likely does not reflect the current market value of the Property . . . ." Thus, the PPM did not hide the fact the purchase price could be grossed up significantly. One only needed to add up the PPM's total maximum investment collected from the TIC investors ($24 million) plus the loan ($50 million) to see it is obviously much higher than the amount ARI paid for the Property.

In conclusion, Plaintiffs were told the negotiated purchase price of the Property would be grossed up so that fees and costs, and an additional $1,306,000 commission, could be paid to ARICP. The disclosure explained this fee, normally paid by the seller, would be the buyers' obligation. The entire Sales Loads, including the $1,306,000 fee, was disclosed in the PPM. It is the payment of this fee that is the alleged harm suffered by Plaintiffs.

In the case before us, the SAC does not allege Plaintiffs were prohibited from asking questions about ARICP's commission or advised not to seek independent legal, financial, or tax advice. They offer no explanation as to why the disclosures in the PPM failed to put them on inquiry notice before investing millions of dollars in a risky and highly speculative commercial real estate deal. We conclude that based on the PPM's disclosures, Plaintiffs in this case were on inquiry notice.

Plaintiffs attempt to factually distinguish the *WA Southwest* case on the grounds their SAC "does not allege that the investment was [orally] represented as 'risk free,' 'not risky' or that [Plaintiffs] believed that the investment was free of any risk." In other words, Plaintiffs believe their case is distinguishable because there were no oral representations further misleading the Plaintiffs or that would have contradicted the documents describing the investment as being highly risky. They argue sustaining the demurrer would create a "new rule of law that investors are always on notice of fraud whenever an investment prospectus utters the word 'high risk.'" LaSalle discussed this factual distinction as hurting not helping Plaintiffs because it shows the Plaintiffs have "even weaker claims than those in *WA Southwest.*" We agree with LaSalle. Unlike the *WA Southwest* plaintiffs, the Plaintiffs in this case have not alleged they were mislead by oral representations and as a result excused from reading the PPM's disclosures. And, in any event, the *WA Southwest's* court's holding was not dependent on the existence of oral misrepresentations. To the contrary, the court's analysis was not influenced by this fact one way or the other.

The plaintiffs in *WA Southwest* alleged they received oral misrepresentations recommending the deal and promising the Sales Loads would be less than 10 percent. (*WA Southwest, supra,* 240 Cal.App.4th at p. 152.) This fact was mentioned in the factual summary of the case but was not relevant to the holding of the case affirming the judgment. The oral misrepresentations were not part of the analysis because these facts did not change the undisputed evidence those plaintiffs received

23

actual written notice of the total Sales Loads and the risks of the investment because it was disclosed to them in the PPM. "[The PPM's disclosures] was sufficient to put plaintiffs on notice that the 'sales load' exceeded the capital gains tax rate. This is not akin to a situation in which a party relies on the statements of a fiduciary about, for instance, the legality of a complicated transaction. [Citation.] Plaintiffs only needed the private placement memorandum and a calculator to obtain the information they now deem essential." (*WA Southwest, supra,* 240 Cal.App.4th at p. 158.) The oral misrepresentations neither excused plaintiffs from their duty of inquiry nor heightened their duty to investigate. The fact was deemed irrelevant.

In this opinion we are not suggesting investors should be on notice of fraud whenever a PPM warns the investment is high risk. Rather, we agree with the *WA Southwest* case's holding that "reasonable diligence" does not consist of ignoring a PPM received prior to an investment that clearly discloses the anticipated fees, expenses, and commissions that would be paid out of the cash investment.

In their letter brief, Plaintiffs assert their case is materially different from *WA Southwest* because the SAC included allegations the PPM promised a suitability review as to each of the TIC investors "in order to determine whether the investment was suitable." Plaintiffs fail to explain why this is a factual distinction that makes a difference. How does this fact make *WA Southwest's* holding inapplicable? We conclude this is a red herring argument.

We acknowledge the SAC alleged ARGUS Defendants used the suitability review as pretext to collect personal and private financial information from the TIC investors and "the TIC Interests were sold to anyone who submitted a subscription." On appeal, Plaintiffs do not explain why this qualifies as a material misrepresentation sufficient, standing alone, to maintain causes of action against these Defendants. It is not alleged an unsuitable TIC investor was a contributing cause to the damages caused by the investment's failure or, for that matter, the cause of any damages. Nor do Plaintiffs claim

24

they would not have invested in the Property had they known this fact at the time. They offer no additional facts that could be pled to create a viable cause of action against these specific Defendants based on this alleged misrepresentation.

For all the above reasons, we find the *WA Southwest* case on all fours with ours. As in the *WA Southwest* case, Plaintiffs failed to meet their burden of alleging the necessary facts for the delayed discovery rule to apply. They were given the opportunity to amend and do not argue any way they could amend that would survive the statute of limitations obstacle. The trial court correctly sustained the demurrer.

DISPOSITION

The judgments are affirmed. Respondents shall recover costs incurred on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.