Filed 6/23/16  Gee v. LaSalle Bank CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ALICE GEE et al., | |
| Plaintiffs and Appellants, | G050844 |
| v. | (Super. Ct. No. 30-2012-00554778) |
| LASALLE BANK, N.A. et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from judgments of the Superior Court of Orange County, Gail Andrea Andler, Judge.  Affirmed.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Nicole M. Catanzarite-Woodward and Eric V. Anderton for Plaintiffs and Appellants.

LINER, Maribeth Annaguey and Kathryn L. McCann for Defendant and Respondent CBRE, Inc.

Brown Rudnick and Joel S. Miliband; Berkowitz Oliver Williams Shaw & Eisenbrant, Anthony J. Durone and Jennifer B. Wieland for Defendant and Respondent Burch & Company, Inc.

Skadden, Arps, Slate, Meagher & Flom, Peter B. Morrison and Kevin J. Minnick for Defendant and Respondent LaSalle Bank, N.A.

Lester & Cantrell, Mark S. Lester, David Cantrell and Colin A. Northcutt for Defendant and Respondent Hirschler Fleischer, APC.

\*     \*     \*

In March 2014, Judge Gail Andler entered rulings on 49 motions made in eight different superior court cases in a single minute order. She explained all the motions were filed in "what has become known as the 'ARI' group of cases." Judge Andler stated, "As with the prior rounds of challenges to the pleadings, since the motions raise issues and arguments common to all cases, the court will reflect the rulings . . . on a single [m]inute [o]rder to be placed in each individual case file."

This appeal arises out of judgments entered in what Judge Andler referred to as "Case 3," following the sustaining of four separate demurrers to the second amended (operative) complaint (SAC) without leave to amend. The 19 appealing plaintiffs include one individual, Alice Gee (Gee), and 18 limited partnerships (ARI-DFW East & West 1, L.P.; ARI-DFW East & West 2, L.P.; ARI-DFW East & West 3, L.P.; ARI-DFW East & West 5, L.P.; ARI-DFW East & West 6, L.P.; ARI-DFW East & West 7, L.P.; ARI-DFW East & West 8, L.P.; ARI-DFW East & West 10, L.P.; ARI-DFW East & West 11, L.P.; ARI-DFW East & West 12, L.P.; ARI-DFW East & West 13, L.P.; ARI-DFW East &West 14, L.P.; ARI-DFW East & West 15, L.P.; ARI-DFW East & West 16, L.P.; ARI-DFW East & West 20, L.P.; ARI-DFW East & West 21, L.P.; ARI-DFW East & West 22, L.P.; and ARI-DFW East & West 23, L.P.). For convenience and clarity in this opinion we will refer to the appealing ARI-DFW East & West L.P. entities and Gee collectively as Plaintiffs. We affirm the four judgments of dismissal at

2

issue in this appeal based on our conclusion the applicable statute of limitations bars recovery.

PROCEDURAL HISTORY

The case concerns Plaintiffs' failed multi-million dollar investment in commercial real estate. In 2005, Plaintiffs invested in two office buildings located in the Dallas, Fort Worth, Texas freeway corridor. The commercial business complex was called DFW East & West (the Property). The transaction was promoted by ARI-DFW Direct Participant, L.P. (the Company), and its related entities and affiliates, referred to collectively by the parties as the ARGUS Defendants. [1]

The purchases were part of an Internal Revenue Code section 1031 exchange, which allowed Plaintiffs to defer capital gains taxes on the sale of other real estate assets they owned. However, all did not proceed as planned and the investment property was foreclosed upon and sold.

In 2012, Plaintiffs (in a class action complaint) sued 21 defendants, but only four, on the periphery of the transaction, are involved in this appeal after the court sustained their demurrers and entered judgments of dismissal. The four defendants are real estate broker CBRE, Inc., securities broker and dealer, Burch & Company (Burch), LaSalle Bank, N.A. (LaSalle), and the law firm Hirschler Fleischer (Hirschler). For convenience and the sake of clarity these four entities will be referred to collectively as Defendants, unless the context requires otherwise.

---

[1] The trial court also sustained the ARGUS Defendants' demurrer without leave to amend. However these entities are not parties to this appeal.

Plaintiffs amended their complaint several times in response to motion practice by the Defendants.[2] The operative SAC alleges 13 causes of action and groups the Defendants into three categories. First, there are seven groups titled "Class Defendants" because they are named by the "Class Plaintiffs." Second, there are "Non-Class Defendants" subject to individual claims. Third, there are "Doe Defendants." This appeal concerns only four "Class Defendants," namely, CBRE, LaSalle, Burch, and Hirschler. For purposes of this appeal, the 13 causes of action can be boiled down to the breach of various fiduciary duties, intentional misrepresentation, and fraud claims against all Defendants. In addition, there is a legal malpractice claim against Hirschler.[3]

The trial court sustained Defendants' demurrers to the SAC, without leave to amend, in part, on the basis that all causes of action were barred by the applicable statute of limitations. In the minute order, Judge Andler commented, "It is an understatement to say that much time and effort has been spent by counsel and the court discussing these pleadings, in some case for years, in order to determine if a pleading could be crafted which could survive a challenge. Each version of each complaint generated demurrers and motions to strike. Although recognizing the valid concerns expressed by a number of defendants, leave to amend was previously granted in recognition of the great liberality the law provides for amending pleadings. There were specific discussions as to what the concerns were, and counsel for plaintiffs had asserted, at oral argument, that the deficiencies could and would be cured. . . . [P]laintiffs were put

---

[2] Burch and LaSalle demurred to the original complaint. The court sustained the demurrers without leave to amend Plaintiffs' claims for disgorgement and unfair business practices under Business and Professions Code section 17200. It granted Plaintiffs' leave to amend the other causes of action. The court rejected the first amended complaint (FAC) for improper use of an "Errata" filing, and thereafter, the Plaintiffs filed the SAC which is identical in substance to the FAC.

[3] Because Plaintiffs do not appeal from the court's dismissal of their accounting and disgorgement claims they are not mentioned in this opinion.

on notice as to the need to plead with greater specificity regarding the roles played by each of the defendants and their alleged acts or omissions. [¶] The court previously commented that plaintiffs appear in some of the pleadings to simply sue anyone and everyone who had anything to do with the transactions, regardless of how remote the participation of some of the defendants might be."

The trial court stated that in addition to sustaining the demurrers on statute of limitations grounds, the court also considered and ruled on causes of action for alternative grounds alleged by Defendants. For example, the court determined some of the fraud-based causes of action failed because Plaintiffs "still plead elements of . . . each cause of action in general terms-identifying the alleged responsible defendant by group, and failing to plead each element with specific facts. It strains credibility to believe that none of the plaintiffs have any recall or records on which to rely in sufficiently pleading these causes of action, given the nature of these transactions and the amount of money involved." Judge Andler added the aiding and abetting allegations fail because Plaintiffs failed to allege facts "that said defendants had 'actual knowledge' that the directly liable defendant intended to commit 'a specific wrongful act' and that said defendants gave substantial assistance to the directly liable defendant." The court repeated the pleadings were defective because, despite "having been previously admonished" by the court, Plaintiffs "have continued to use 'group pleading' for apparently related entities . . . and the parties must be able to differentiate the specific roles, acts and omissions alleged as to each defendant 'lumped together' in the group allegations." (Emphasis omitted.)

Plaintiffs challenge this ruling on appeal, maintaining they timely filed their complaint and adequately complied with the delayed discovery rule. We recognize the trial court's ruling was made after it took judicial notice of the parties' Private Placement Memorandum (PPM), and for purposes of this appeal, we granted Hirschler's motion for judicial notice of the same applicable PPM.

5

"In conducting our de novo review, we 'must "give[ ] the complaint a reasonable interpretation, and treat[ ] the demurrer as admitting all material facts properly pleaded." [Citation.] Because only factual allegations are considered on demurrer, we must disregard any "contentions, deductions or conclusions of fact or law alleged . . . ."' [Citation.]" (*WA Southwest 2, LLC v. First American Title Ins. Co.* (2015) 240 Cal.App.4th 148, 151 (*WA Southwest*).)

*The Allegations of Wrongdoing*

The pertinent facts are alleged in Plaintiffs' pleadings and the PPM. In the SAC, Plaintiffs seek to unravel the whole failed investment on the grounds they would not have invested in the Property had they known the total up-front costs, or "Sales Loads," actually exceeded the 15 percent capital gains tax they sought to defer by making the investment. Specifically, they allege there was an undisclosed $271,000 mark up in the purchase price. They complain, "The transaction was nothing more than a real estate scam put together by [Defendants] to line their own pockets." Plaintiffs also allege they were misled about the negative financial impact of plans for widening the highway next to the property.

The PPM disclosed the Company was "formed to acquire and operate all of, or an undivided interest in," the Property. It stated one of the ARGUS Defendants, ARI-DFW East & West, LP (ARI) would first purchase the property from a third party seller for $13,821,000 using a $10,350,000 loan from LaSalle. ARI's affiliate, ARI Commercial Properties, Inc. (ARICP), acted as the real estate broker (and is listed as one of the ARGUS Defendants).

Plaintiffs alleged the ARGUS Defendants used a PPM and marketing materials to offer two types of "'Securities'" in the "'Offering.'" Using cash from a prior sale of real property, investors could purchase tenancy in common (TIC) or limited

partner (LP) interests (referred to collectively as Securities) in the Property. The Securities Offering required the help of several interrelated ARGUS Defendants.[4]

Plaintiffs alleged their class action included both persons who purchased securities as partnership interests and the "Special Purpose Entities" (SPEs) organized by Defendants under the names ARI-DFW East & West 1, L.P. through ARI-DFW East & West 27, L.P. each of which acquired separate TIC interests. Of the 27 SPEs who purchased TIC interests, 18 are appealing. Additionally this appeal is brought by Gee, an individual who purchased a LP interest.

In their complaint, Plaintiffs stated, "The ARGUS Defendants orchestrated a scheme whereby the Property was placed under contract by straw-buyer ARI, a newly organized company with nominal capital and unable to close the purchase. In a simultaneous closing [the Plaintiffs] provided virtually all of the down payment funds which combined with the purchase money bank loan from [LaSalle], allowed the Property closing to occur. . . . The [Plaintiffs] were deceived through the use of double escrows which made it appear ARI was selling them the TIC [i]nterests in the Property when in fact they were direct purchasers providing virtually all of the funds to close the deal. Thereafter, over a roughly seventy-five day period, ARI would sell the remainder

---

[4] ARI and the Company were affiliated with the following other ARGUS Defendants. As previously mentioned, ARICP was the real estate broker for both ARI and the Plaintiffs during the acquisition of the securities, and it later served as a property manager of the Property. ARI-DFW, LLC was the general partner for both entities (ARI's General Partner). Argus Realty Investors, L.P. was the managing member of General Partner (Managing Member). Argus Realty, LLC (Argus Realty) was the general partner of Managing Member and sponsored ARI's sale of the TIC/LP interests. ARI Financial Services, Inc. (the Dealer) was the registered broker dealer and affiliate underwriter of the securities. Also included under the umbrella title of ARGUS Defendants, were several individuals who managed and ran the various entities (Richard Gee, Maxwell Drever, Timothy Snodgrass, Harris Totakhail, Joseph Corpal, and David Wong).

of the [p]roperty ownership to those members of the [c]lass who could purchase TIC [i]nterests post-closing of the Property, thereby pocketing those funds as well."

Plaintiffs alleged the ARGUS Defendants and their counsel, Hirschler, prepared and distributed the PPM and marketing materials through Burch, the lead underwriter and managing broker-dealer, who in turn distributed the PPM to investors through a group of soliciting broker-dealers. They asserted CBRE "appeared to act initially only as the seller's real estate agent in the purchase of the Property" but CBRE knew the purchase price was illegally marked up and it had a duty to disclose the scheme to Plaintiffs. They alleged CBRE also had a duty to disclose because it agreed, prior to closing, to act as the buyers' leasing agent post-closing.

Plaintiffs asserted the PPM represented the property's purchase price "was the same as that which had been negotiated with the unrelated seller who was paying the commission" to ARICP. Plaintiffs stated they were led to believe the "price had been agreed upon that had the unrelated seller paying the commission to [ARICP] not [Plaintiffs]." They alleged Defendants "participated in marking up the purchase price to hide the true facts that both [ARICP] and CBRE were receiving commissions described as paid by the Property seller when the truth was the unknowing [Plaintiffs] were paying the buyers' commission as a hidden 'Sales Load' (as described below)."

Plaintiffs maintained they funded the entire down payment to acquire the Property and then ARI claimed "to have purchased the Property for the commission-grossed-up price of $13,821,000 (the 'Purchase Price') (grossed up by at least $271,000 commission paid to [ARICP], the 'Markup') at "Closing." Plaintiffs alleged "the true costs and true purchase price of the Property was concealed through the use of double blind escrows where the [Plaintiffs] were falsely led to believe that ARI had acquired the Property and sold it to them when in fact they provided virtually all the required funds."

The SAC discussed several misrepresentations and non-disclosures. Plaintiffs alleged ARI and the Company raised $16.6 million by the Offering and

8

represented the "Sales Loads," "the amount disclosed as the cost to offer real estate Securities including securities sales commissions, fees and costs, to be a total of $807,000 or 12.9 [percent] of the Gross Offering Proceeds of [$16.6 million]." Plaintiffs stated that had they known the Sales Loads would be 17.2 percent, which is greater than capital gains taxes, they would not have purchased the Securities.[5]

In addition to the misrepresented Sales Loads, Plaintiffs questioned the amount of loan fees and complained the PPM falsely promised a suitability review of all TIC investors. And finally, Plaintiffs asserted the PPM and Offering failed to disclose the Property was located next to a highway slated for widening that would "materially and adversely impact the value of the Property and ergo the investment." Plaintiffs alleged they would not have acquired the Property had they known about the widening project. However, they did not allege the loan fees or suitability review were material to their decision to make the investment.

*Information Disclosed at Time of Investment in the PPM*

It was anticipated the Company would raise funds pursuant to the terms described in PPM and purchase some or all of the property from ARI. The PPM stated ARI would sell an "undivided interest in the Property to the Company at the price (determined on a pro rata basis) paid by ARI for the Property plus the Company's share of transfer and due diligence expenses, carrying costs attributable to funds advanced . . . to acquire the Property, and other fees and expenses incurred in the acquisition and financing of the Property, including a $165,500 promotional fee to be paid to ARI."

Under the PPM, the Company offered TIC and LP interests in the Property as set forth in the memorandum and addendum. It explained, "For the purposes of this investment, the price of a Unit includes not only a percentage of the purchase price for

---

[5]     Plaintiffs calculate this figure as follows:  $271,000 of the $6.25 million maximum equity contribution is 4.3 percent. The PPM disclosed a Sales Load of 12.9 percent, but with the additional 4.3 percent, the Sales Load increased to 17.2 percent.

the Property but also a percentage of (i) the Selling Commissions and Expenses (as set forth in the ESTIMATED USE OF PROCEEDS below), (ii) *aggregate real estate brokerage commissions of $271,000 paid to . . . an affiliate of ARI*, and (iii) a promotional fee of $165,500 paid to ARI."  (Italics added.)

The "ESTIMATED USE OF PROCEEDS" is a detailed chart setting forth the estimated use of the $24 million investment proceeds raised from TIC investors.  In the scenario in which the full amount of equity was raised as follows:

$4,996,125 (79.9 percent) would be used as a down payment on the Property; related to the down payment were the following five costs:

$469,000 (7.5 percent) would be used to pay "Selling Commissions";

$165,500 (2.6 percent) would be used to pay the "Promotional Fee";

$150,000 (2.4 percent) would be used to pay "Offering and Organization Expenses";

$125,000 (2 percent) would be held for a "Marketing Allowance";

$103,500 (1.7 percent) would be used to pay loan fees and costs;

$77,875 (1.2 percent) would be used to pay the estimated closing costs;

$63,000 (1 percent) would be for a "Due Diligence Allowance and Placement Fee";

$60,000 (1 percent) would be used to pay estimated carrying costs; and

$40,000 (0.6 percent) would be used to pay lender legal fees.  Six of these expenses have a corresponding footnote containing further explanations, which we will discuss anon.

The chart did not classify all of the above expenses the same way.  Four categories of expenses (amounting to 12.9 percent) were subtracted from the gross offering proceeds of $6.25 million, resulting in a line item labeled "Available for Investment" of $5,443,000.  Those four expenses were called "Offering and Organization

Expenses" "Selling Commissions" "Marketing Allowance" "Due Diligence Allowance and Placement Fee."

Below the line item of money "Available for Investment" the chart lists the remaining six accounted for expenses. The first expense, titled, "Down Payment-Purchase of Property" (79.9 percent) is followed by an list of 5 sub-categories relating the down payment (totaling 7.1 percent). Footnote 3, inserted next to the "Down Payment" category advised that in addition to the down payment, ARI "anticipates obtaining" a $10,350,000 loan and ARI would receive a promotional fee of $165,500 "for its role in the Offering." This helps explain why directly under the line item "Down Payment" there are five expenses related to taking out a loan, included "Loan Fees and Costs," "Lender Legal Fees," "Closing Costs," and "Carrying Costs."

Relevant to this case, the ESTIMATED USE OF PROCEEDS's chart is on the same page as, and immediately above, a paragraph describing the buyer's obligation to pay a $271,000 real estate brokerage commission (the ARICP Paragraph). Plaintiffs' maintain this $271,000 was a hidden fee used to gross up the purchase price. They believed the PPM promised this fee was the seller's obligation.

The ARICP Paragraph begins with the statement ARICP "will receive $271,000 from the [s]eller as a real estate brokerage commission on the purchase of the Property." The second sentence clarifies, "Commissions are normally paid by the seller rather than the buyer. However, *the purchase price will generally be adjusted upward to take into account this obligation* of the [s]eller so that in effect the [TICs], including the Company, as the buyers, will collectively bear all of this real estate brokerage commission in the purchase price of the Property. The [TICs], including the Company, *also expect to pay commissions* in connection with the sale of the Property, which will reduce the net proceeds to the [TICs], including the Company, of any such sale." (Italics added.) In short, the TIC investors were warned they would be responsible for paying a

11

portion of ARI's broker's commission ($271,000) *in addition to* commissions earned during the sale of the Property.

The $271,000 commission is not separately listed on the ESTIMATED USE OF PROCEEDS chart of expenses, however, there was listed an estimated $469,000 in "Selling Commissions." It is unclear from the chart whether the ARICP $271,000 commission is included within this larger sum of "Selling Commissions."

We recognize the PPM contained additional information and further defined "Selling Commissions and Expenses." For example, footnote 2, typed next to "Selling Commissions" explained the nature of the expenses listed below it. Footnote 2 stated, "The Company may accept subscriptions for Units net of all or a portion of the Selling Commissions otherwise payable as described under DISTRIBUTION PLAN below." This sentence is difficult to understand without also reviewing the DISTRIBUTION PLAN (the Distribution Plan), found one hundred pages later in the PPM.

The Distribution Plan portion of the PPM stated the $6.25 million Offering is for a maximum of 1,000 Units ($6,250 per Unit.). The Distribution Plan next explained how the Company intended to distribute the *net proceeds* from the sale of each Unit "to the Company's capital." It defined the $6.25 million cash collected during the Offering as *gross proceeds*. It was anticipated the Company would be capitalized with net proceeds, calculated by subtracting "Offering and Organization Expenses and Selling Commissions and Expenses" from the gross proceeds.

These two terms were defined elsewhere in the PPM. Footnote 1 of the chart explained the "Offering and Organization Expenses" represented a reimbursement of funds owed to the General Partner (one of the ARGUS Defendants). To summarize, footnote 2 and the Distribution Plan explain "Selling Commissions and Expenses" would not exceed 10.5 percent of the gross proceeds of the Offering and would be paid to both the "Broker-Dealers" and "the Managing Broker-Dealer."

12

Specifically, the Distribution Plan anticipated "Broker-Dealers (collectively the 'Selling Group')" would offer and sell the units to qualified investors to raise the cash needed for capitalization. The Managing Broker-Dealer would supervise and coordinate the Selling Group members, who "will receive Selling Commissions of up to 7.5 [percent] of the gross proceeds of the Offering." The Managing Broker-Dealer can also receive a 2 percent "nonaccountable marketing allowance," plus a 0.5 percent "nonaccountable due diligence allowance" and a 0.5 percent "placement fee" Therefore, The Managing Broker-Dealer and Selling Groups were owed "Selling Commissions and Expenses" comprised of "Selling Commissions," a placement fee, a marketing allowance, and a due diligence allowance totaling (and not to exceed) 10.5 percent.

As mentioned earlier, the ESTIMATED USE OF PROCEEDS chart did not classify all the expenses the same way and listed four expenses (amounting to 12.9 percent) that were subtracted first from the gross offering proceeds of $6.25 million, resulting in a line item labeled "Available for Investment" of $5,443,000. After reviewing the footnotes and the Distribution Plan, it becomes apparent these four expenses (totaling 12.9 percent) refer specifically to the "Offering and Organization Expenses and Selling Commissions and Expenses" as defined in footnotes 1 and 2 and the Distribution Plan. These expenses are classified differently than the others because it was anticipated the Company could only be capitalized with *net proceeds* from the Offering (calculated by subtracting from the gross proceeds the "Selling Commissions," which included a placement fee, a marketing allowance, and a due diligence allowance totaling 10.5 percent, and the "Offering and Organization Expenses" of 2.4 percent. Thus, 12.9 percent was subtracted first from the $6.25 million in gross proceeds from the Offering. The second grouping of expenses (the loan and promotional fees) were listed separately and totaled 7.1 percent.

In summary, the ESTIMATED USE OF PROCEEDS chart, the ARICP paragraph, and various footnotes revealed a potential "Selling Commission" of $469,000

in the category of expenses used to calculate net proceeds to capitalize the Company. We recognize it is unclear whether ARICP's $270,000 brokerage commission was included as this category of expense or was intended as a separate obligation. There is no evidence the investors were told one way or the other. However, what is plainly clear is the PPM disclosed to Plaintiffs their obligation to pay a Selling Commission *and* ARICP's commission.

The PPM also warned, "***The purchase price to be paid by investors for the Interests and Units exceeds the appraised value of the Property.*** ARI intends to purchase the Property for an aggregate Property purchase price of $13,821,000, plus additional carrying costs, due diligence expenses, and other fees and expenses incurred in the acquisition and financing of the Property. . . . ARI and the Company intend to acquire proceeds from the sale of all of the Interests and the Units, together with the Loan . . . equal to $15,200,000. The purchase price for the Units and Interests is determined unilaterally by ARI and the Company and likely does not reflect the current market value of the Property, and is not based on an arm's length negotiation with the Purchasers or Limited Partners or supported by an appraisal of the Property. In fact, the total purchase price . . . will be significantly higher than the aggregate price to be paid by ARI in its acquisition of the Property." In short, the PPM revealed the sale price was being marked up to cover other fees and costs.

And finally, simple arithmetic shows the investment totaled $16,580,000 ($6.25 million equity from investors plus a $10,350,000 bank loan), which far exceeded the reported purchase price of the property ($13,821,000). Additionally, the PPM contained multiple risk warnings, in bold italicized print, that the venture was "highly speculative and involve[d] substantial risks." Investors were advised to consult their own legal and tax advisors "to ascertain the merits and risks of an investment in the Units before investing." The PPM also warned in bold type, "This Memorandum contains forward-looking statements that involve risks and uncertainties. The Company's results

14

may differ significantly from those disclosed in this Memorandum." (Bold emphasis omitted.)

DISCUSSION

*1. Standard of Review*

A demurrer is used to test the sufficiency of the factual allegations of the complaint to state a cause of action. (Code Civ. Proc., § 430.10, subd. (e).) The facts pled are assumed to be true and the only issue is whether they are legally sufficient to state a cause of action. "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

Moreover, "As a general rule in testing a pleading against a demurrer the facts alleged in the pleading are deemed to be true, however improbable they may be. [Citation.] The courts, however, will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604.)

15

*2. Applicable Statutes of Limitations & Delayed Discovery Rule*

The gravamen of Plaintiffs' complaint is they overpaid for the Property because the purchase price was bumped up to extract additional fees. Plaintiffs claim they would not have invested if they knew the "Sales Loads" (i.e., the fees, expenses, and commissions paid) exceeded the capital gains tax rate of 15 percent. In their demurrers, each defendant argued the applicable statute of limitations barred all claims. On appeal, the parties agree the applicable statute of limitations was three years. (Code Civ. Proc., § 338, subd. (d).) Plaintiffs purchased the property in 2005 and the initial complaint was not filed until six years later in 2012.

"Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' [Citations.] An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. [Citations.]" (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806-807.) "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.] Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period. [Citations.]" (*Id.* at p. 807.) "The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. [Citations.]" (*Ibid.*) "The discovery rule . . . allows accrual of the cause of action even if the plaintiff does not have reason to suspect the defendant's identity." (*Ibid.*)

In their appeal, Plaintiffs argue the court should have applied the delayed discovery rule to toll the statute of limitations in their case. "'By their reliance on the "discovery rule," [P]laintiffs concede by implication that, without it, their claims are barred by one or more statutes of limitations.' [Citation.] Unless the discovery rule applies, the statute of limitations began running when [P]laintiffs made what they now

16

deem to be unsuitable investments, paid what they now deem to be an unreasonable (and undisclosed) 'sales load,' and had in their possession documents disclosing the downsides of the investment (e.g., the risks of the investment and the expenses beyond the acquisition price of the Property)." (*WA Southwest, supra,* 240 Cal.App.4th at p. 156.)

"California law recognizes a general, rebuttable presumption, that Plaintiffs have 'knowledge of the wrongful cause of an injury.' [Citation.] In order to rebut that presumption, '"[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." [Citation.] In assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to "show diligence"; "conclusory allegations will not withstand demurrer.' [Citation.]" (*Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 638.)

In their operative complaint, Plaintiffs denied knowledge of facts that would make them question the reliability of Defendants' representations regarding the TIC investments. On appeal, Plaintiffs maintain the court erred in finding conclusory their allegations of time, manner of discovery and inability to have made an early discovery.

Plaintiffs assert they adequately alleged the time and manner of discovery in the SAC. The complaint alleged the fraud was not discovered by Plaintiffs until the TIC/LP interests were "brought to counsel for consultation following the Medtronics' relocation representations" in a different real estate litigation case, referred to as the "'Shoreview Litigation,'" and involving the ARGUS Defendants. Plaintiffs alleged, "During counsel's investigation of Shoreview Property they discovered the seller-paid commission/purchase price mark-up fraud. The investigation led from one transaction to another until reaching Plaintiffs here who requested in . . . . 2012 that counsel review the

17

offering documents in this case. . . ." Plaintiffs assert this allegation clearly states when and how they discovered the wrongdoing.

Plaintiffs also assert the court erroneously determined they did not allege the inability to discover the misconduct earlier despite reasonable diligence. In paragraphs 136-138 of the SAC, Plaintiffs alleged they could not have with diligence discovered the fraud because they reasonably relied on the ARGUS Defendants' representations and marketing. They learned of the highway widening misrepresentation when the taking process started. They asserted that after the acquisition the ARGUS Defendants continued to provide services as a fiduciary to the Plaintiffs in the form of property management, leasing, accounting, and other property-related services.

*3. The WA Southwest Case*

After briefing was completed in this appeal, a different panel of this court published the *WA Southwest* case and we gave the parties an opportunity to submit letter briefs to discuss its relevance to this appeal. The case is essentially identical to the one before us now.

Both cases concern failed real estate investments in which investors sought to defer payment of capital gains taxes by investing in TIC interests in real property marketed by investment firms. (*WA Southwest, supra,* 240 Cal.App.4th at pp. 152-153.) In both cases, plaintiffs invested after receiving a PPM containing detailed disclosures and risk warnings. The cases involved deals whereby a company expected to purchase property from a third party and then offer investors the opportunity to purchase TIC interests in the property. (*Id.* at p. 153.) And, in both cases, the investors lost their money and (represented by the same law firm) sued seemingly every entity or individual with any connection whatsoever to the investments, claiming they would not have invested had they known about hidden fees that increased the Sales Loads above the capital gains tax rate. (*Ibid.*) In our case, and in *WA Southwest*, the trial court sustained

18

demurrers and entered judgment for certain defendants based on, among other things, the applicable statutes of limitations.  (*Id.* at p. 150.)

In *WA Southwest*, the court affirmed the judgment of dismissal, holding that the plaintiffs were on inquiry notice of their injury at the time of their investments because of detailed disclosures in the PPM they received prior to investing.  (*WA Southwest, supra,* 240 Cal.App.4th at pp. 157-158.)  The disclosures in *WA Southwest* revealed that the negotiated purchase price of the property was $11.6 million, but $13,170,000 was being raised so that other expenses could also be paid, including a $505,000 fee payable to an investment organizer/promoter company.  (*Id.* at pp. 153-154.)  The disclosures did not suggest the seller of the property was paying the $505,000 fee or any of the other expenses making up the difference between the negotiated purchase price and the total investment cost.  (*Ibid.*)  Accordingly, the *WA Southwest* court rejected plaintiffs' theory they were not on notice the additional fees created a Sales Load greater than the capital gains tax rate they wanted to avoid.

Similarly, in this case the front page of the PPM plainly disclosed the price for one Unit (i.e., the investment cost) included "not only a percentage of the purchase price" but also a percentage of three additional costs, namely (1) selling commissions and expenses set forth in the table of ESTIMATED USE OF PROCEEDS, (2) $271,000 paid to ARICP for "aggregate real estate brokerage commission", and (3) $165,500 paid to ARI for a promotional fee.  This disclosure did not suggest the seller was paying the $271,000 commission or the other anticipated additional expenses.  The PPM's first page plainly stated the investor was expected to pay a percentage of the purchase price *plus* a large promotional fee, a large brokerage commission, and "Selling Commissions and Expenses."

The investor's obligation to pay these three expenses in addition to the purchase price is repeated on page 12 of the PPM.  As mentioned above, the ESTIMATED USE OF PROCEEDS chart contains two groupings of expenses (1) the

19

expenses related to capitalization of the Company, and (2) the down payment expenses. The $165,500 promotional fee listed on the first page is specifically included as a stand-alone cost within the chart's second group of expenses (of down payment costs). The first page's reference to "Selling Commissions and Expenses" is one of the categories of expenses listed as part of the first group of expenses related to capitalization. The third expense listed on the first page, ARICP's $271,000 commission, is not specifically identified on the chart. However, a detailed description of this expense was included in paragraph directly beneath the chart, i.e., the ARICP Paragraph.

Plaintiffs focus on the first sentence of the ARICP Paragraph that states ARICP "will receive $271,000 from the [s]eller as a real estate brokerage commission on the purchase of the Property." However, the sentence cannot be viewed in a vacuum. The next sentence explains that the commission, "normally paid by the seller," will in fact be paid by the buyers, and the purchase price "*will generally be adjusted upward* to take into account this obligation of the [s]eller so that in effect the [TICs] . . . as the buyers, will collectively bear all of this real estate brokerage commission in the purchase price of the Property." (Italics added.) This paragraph confirms the statement made on the first page of the PPM that the buyers were obligated to pay the $271,000 and further explained the purchase price would be grossed up to cover this cost.

The ARICP Paragraph concludes, "The [TICs], including the Company, also expect to pay commissions in connection with the sale of the Property, which will reduce the net proceeds to the [TICs], including the Company, of any such sale." This last sentence suggests the $271,000 would be in addition to the "Selling Commissions and Expenses" listed in the first group of costs in the ESTIMATED USE OF PROCEEDS chart. As mentioned, those selling commissions reduced the net proceeds related to capitalization of the company, i.e., the expense outlined in the Distribution Plan portion of the PPM.

20

In the *WA Southwest* case, the court rejected plaintiffs' argument the statute of limitations only began running when they consulted tax and accounting specialists six years after they made their investment, concluding this argument ignores the disclosures made in the PPM. It stated, "The problem with this position is that the private placement memorandum provided to plaintiffs prior to their investments clearly disclosed the fees, expenses, and commissions that would be paid out of their cash investments, as well as the risky nature of the investments. These were illiquid, unregistered securities, which were only made available to accredited investors. Reasonable diligence in such circumstances does not consist of ignoring a private placement memorandum received prior to making an investment. (See *Casualty Ins. Co. v. Rees Investment Co.* (1971) 14 Cal.App.3d 716, 719-720 [tenant plaintiff failed to plead reasonable diligence in discovering unfair terms of lease in its possession]; *Marlow v. Gold* (S.D.N.Y., June 13, 1991, No. 89 Civ. 8589 (JSM)) U.S.Dist. Lexis 8106, p. *27 ['plaintiff abrogated his duty of inquiry of reasonable diligence by recklessly failing to familiarize himself with the prospectus'].) This is not a case in which the plaintiff 'possessed no factual basis for suspicion.' (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1326.) The information and disclosures in the private placement memorandum put plaintiffs on notice of the falsity of any communications they may have received about the Sales Loads, tax advantages, or risk-free nature of the investments. The delayed discovery rule does not apply." (*WA Southwest, supra,* 240 Cal.App.4th at p. 157.)

We agree with the *WA Southwest* case's discussion that the existence of alleged fiduciary relationships does not give Plaintiffs in this case a free pass with respect to the statute of limitations. "'Where a fiduciary obligation is present, the courts have recognized a postponement of the accrual of the cause of action until the beneficiary has knowledge or notice of the act constituting a breach of fidelity. [Citations.] The existence of a trust relationship limits the duty of inquiry. "Thus, when a potential plaintiff is in a fiduciary relationship with another individual, that plaintiff's burden of

21

discovery is reduced and he is entitled to rely on the statements and advice provided by the fiduciary.'" [Citation.] But, even assuming for the sake of argument that each of the respondents had a fiduciary duty to plaintiffs, this does not mean that plaintiffs had no duty of inquiry if they were put on notice of a breach of such duty. [Citation.]" (*WA Southwest, supra,* 240 Cal.App.4th at p. 157.) As discussed earlier in this opinion, Plaintiffs relying on the discovery rule must plead "'"'the inability to have made earlier discovery despite reasonable diligence.'"' [Citation.] Plaintiffs have an obligation to plead facts [and no conclusory allegations] demonstrating reasonable diligence. [Citation.]" (*Ibid.*)

Also applicable to this case is the *WA Southwest* case's discussion that a potentially misleading disclosure in the PPM did not create an issue of fact as to whether Plaintiffs were on notice of the full Sales Loads. (*WA Southwest, supra,* 240 Cal.App.4th at p. 158.) In the *WA Southwest* case, the chart estimating the use of investment proceeds did not classify a $505,000 acquisition fee "as a cost to investors in the same way as selling commissions or organization and offering expenses." (*Ibid.*) The plaintiffs argued this separation could be read as increasing the value of the property, even though elsewhere in the PPM the item was described as an expense not an asset. The court disagreed, stating, "But it cannot be denied that the entire sales load, including the $505,000 fee, was disclosed to plaintiffs in the [PPM]. The payment of these fees was the alleged harm suffered by plaintiffs. One can certainly question, particularly in retrospect, the value of the services provided by [the entity receiving the acquisition fee] and the reasonableness of the total sales load. But the only issue here is whether plaintiffs were on notice of the total sales load and the risks of the investment. They were." (*Ibid.*)

In our case, the $271,000 commission was not specifically classified anyplace on the ESTIMATED USE OF PROCEEDS chart, which supports Plaintiffs' theory it was arguably misleading how they should categorize the commission. And in

hindsight, they question the validity of the commission. But as was the case in *WA Southwest,* it cannot be denied that the entire Sales Loads, including the $270,000 expense, was disclosed to Plaintiffs in the PPM. They were put on notice and cannot toll the statute of limitations by pleading delayed discovery.

As in the *WA Southwest* case, the PPM in this case disclosed a long list (spanning 18 pages) of "RISK FACTORS." One risk disclosed was that the purchase price paid by the investors could exceed the appraised value of the Property. The PPM explains ARI will purchase the property for "$13,821,000 . . . plus additional carrying costs, due diligence expenses, and other fees and expenses incurred in the acquisition and financing of the Property. . . . ARI and the Company intend to acquire proceeds . . . equal to $15,200,000. The purchase price . . . is determined unilaterally by ARI and the Company and likely does not reflect the current market value of the Property . . . ." Thus, the PPM did not hide the fact the purchase price could be grossed up significantly. One only needed to add up the PPM's total maximum investment collected from the TIC and LP parties ($6.25 million) plus the loan ($10,350,000) to see it is obviously much higher than the $13,821,000 ARI initially paid for the Property.

In conclusion, Plaintiffs were told the negotiated purchase price of the Property would be grossed up so that fees and costs, and an additional $271,000 commission, could be paid to ARICP. The disclosure explained this fee, normally paid by the seller, would be the buyers' obligation. The entire Sales Loads, including the $271,000 fee, was disclosed in the PPM. It is the payment of this fee that is the alleged harm suffered by Plaintiffs.

In the case before us, the SAC does not allege Plaintiffs were prohibited from asking questions about ARICP's commission or advised not to seek independent legal, financial, or tax advice. They offer no explanation as to why the disclosures in the PPM failed to put them on inquiry notice before investing millions of dollars in a risky

23

and highly speculative commercial real estate deal. We conclude that based on the PPM's disclosures, Plaintiffs in this case were on inquiry notice.

Plaintiffs attempt to factually distinguish the *WA Southwest* case on the grounds their SAC "does not allege that the investment was [orally] represented as 'risk free,' 'not risky' or that [Plaintiffs] believed that the investment was free of any risk." In other words, Plaintiffs believe their case is distinguishable because there were no oral representations further misleading the Plaintiffs or that would have contradicted the documents describing the investment as being highly risky. They argue sustaining the demurrer would create a "new rule of law that investors are always on notice of fraud whenever an investment prospectus utters the word 'high risk.'" LaSalle discussed this factual distinction as hurting not helping Plaintiffs because it shows the Plaintiffs have "even weaker claims than those in *WA Southwest.*" We agree with LaSalle. Unlike the *WA Southwest* plaintiffs, the Plaintiffs in this case cannot suggest they were mislead by oral representations and excused from reading the PPM's disclosures. And, in any event, the *WA Southwest's* court's holding was not dependent on the existence of oral misrepresentations. To the contrary, the court's analysis was not influenced by this fact one way or the other.

The plaintiffs in *WA Southwest* alleged they received oral misrepresentations recommending the deal and promising the Sales Loads would be less than 10 percent. (*WA Southwest, supra,* 240 Cal.App.4th at p. 152.) This fact was mentioned in the factual summary of the case but was not relevant to the holding of the case affirming the judgment. The oral misrepresentations were not part of the analysis because these facts did not change the undisputed evidence those plaintiffs received actual written notice of the total Sales Loads and the risks of the investment because it was disclosed to them in the PPM. "[The PPM's disclosures] was sufficient to put plaintiffs on notice that the 'sales load' exceeded the capital gains tax rate. This is not akin to a situation in which a party relies on the statements of a fiduciary about, for

24

instance, the legality of a complicated transaction. [Citation.] Plaintiffs only needed the private placement memorandum and a calculator to obtain the information they now deem essential." (*WA Southwest, supra,* 240 Cal.App.4th at p. 158.) The oral misrepresentations neither excused plaintiffs from their duty of inquiry nor heightened their duty to investigate. The fact was deemed irrelevant.

In this opinion we are not suggesting investors should be on notice of fraud whenever a PPM warns the investment is high risk. Rather, we agree with the *WA Southwest* case's holding that "reasonable diligence" does not consist of ignoring a PPM received prior to an investment that clearly discloses the anticipated fees, expenses and commissions that would be paid out of the cash investment.

In their letter brief, Plaintiffs assert their case is materially different from *WA Southwest* because the SAC included allegations the PPM promised a suitability review as to each of the TIC investors "in order to determine whether the investment was suitable." Plaintiffs fail to explain why this is a factual distinction that makes a difference. How does this fact make *WA Southwest's* holding inapplicable? We conclude this is a red herring argument.

We acknowledge the SAC alleged ARGUS Defendants used the suitability review as pretext to collect personal and private financial information from the TIC investors and "the TIC Interests were sold to anyone who submitted a subscription." On appeal, Plaintiffs do not explain why this qualifies as a material misrepresentation sufficient, standing alone, to maintain causes of action against these Defendants. It is not alleged an unsuitable TIC investor was a contributing cause to the damages caused by the investment's failure or, for that matter, the cause of any damages. Nor do Plaintiffs claim they would not have invested in the Property had they known this fact at the time. They offer no additional facts that could be pled to create a viable cause of action against these specific Defendants based on this alleged misrepresentation.

25

For all the above reasons, we find the *WA Southwest* case on all fours with ours. As in the *WA Southwest* case, Plaintiffs failed to meet their burden of alleging the necessary facts for the delayed discovery rule to apply and we see no way for Plaintiffs to adequately amend their complaint to plead the discovery rule. The trial court correctly sustained the demurrer.

*4. The Highway Widening*

As an alternative argument in their opening brief, Plaintiffs assert their claims as to the highway expansion are timely without the delayed discovery rule. They also assert this additional allegation of misconduct distinguishes the case from *WA Southwest.* We agree the additional allegation was not addressed in *WA Southwest*, but it does not save the case.

The SAC alleged the PPM and Offering failed to disclose the Property, which "fronts a section of Texas State Highway 183," was slated for a highway widening project (Highway Widening). Plaintiffs claimed, "[The Highway Widening] would materially and adversely impact the value of the Property and ergo the investment. As of the date the subject securities were made, the following information on the Highway Widening was available to ARGUS Defendants and BLAKE Defendants as due diligence professionals related to the Property: [¶] a. The Property . . . was identified as early as 1999 in the Texas Department of Transportation (TxDOT) Major Improvement Study (MIS) that identified $1.4 billion of recommended improvements including the lane additions and arterial improvements. [¶] b. The engineering and environmental analysis process for what was called this SH183 Study Corridor continued steadily through a series of public hearings from 1999 [to] 2005. [¶] c. The study and hearings process culminated in final presentations to the Irving City Council on April 28, 2005, and as of that date the Highway Widening impact would have been known had the same been investigated. [¶] d. The Highway Widening would have reduced the number of available parking spaces at the Property which would have been material because, and as

26

disclosed by the PPM, the Property . . . already had [a] deficient number [of] parking spaces for compliance with local zoning ordinances."

The PPM includes lack of parking as one of the "RISK FACTORS." It discloses one of the real estate risk factors is "***The Property has fewer parking spaces than required under existing zoning regulations***." The warning explains "ARI is in the process of obtaining approval from the requisite authorities for this nonconforming variance, but there can be no assurances that such approvals will be obtained." In the SAC, Plaintiffs alleged they were not informed of the Highway Widening project and if they had been told there would be less parking spots on the Property they would not have invested.

The trial court did not specifically discuss the Highway Widening issue when sustaining the demurrers. However, it did remind the parties of the lengthy prior discussions about the need for pleading allegations with greater specificity. After reviewing and comparing the original and SAC complaints, we found only a few differences. First, Plaintiffs added the names of the two "due diligence professionals" who *could have* learned about the Highway Widening project. The original complaint simply stated the information was available to "due diligence professionals related to the Property." Plaintiffs did not assert the professionals actually knew about the city works project and wrongfully withheld the information. Additionally, there are no allegations specifically connecting the two due diligence professionals with the Defendants in this appeal. Why did these specific professionals owe Plaintiffs the duty of due diligence and a report on the Highway Widening project?

Second, Plaintiffs deleted from the original complaint a paragraph stating the Property, fronting the highway, "had well known bottleneck issues" and the Highway Widening would "materially and adversely impact the value of the investment." This allegation was likely deleted because it infers the information was readily available to the investors. Third, Plaintiffs deleted a paragraph asserting CBRE, as real estate broker for

27

the third party seller, had a duty to disclose information regarding the Highway Widening and should have noticed the PPM did not discuss it.

On appeal, Plaintiffs allege their causes of action based on the failure to disclose the Highway Widening project are not time barred. Plaintiffs maintain they did not suffer an actual "injury" until the Property was reduced in size after the city council started its "takings process" in 2011 to facilitate the Highway Widening. Plaintiffs suggest the Property needed to be "actually affected by the development" to trigger the statute of limitations. We disagree. As stated in the original complaint, the injury occurred at the time of investment because the Highway Widening project immediately affected the investment's value and level of risk. If having less parking spaces than legally required was a fully disclosed risk factor related to this property, the plans to further reduce the number of spaces would certainly only heighten the investment's risk level and lower its value. It can be inferred from the Plaintiffs' claim they would not have invested had they known about the Highway Widening, that this information made the Property undesirable at the time of the Offering, not just when the takings process started.

We conclude the injury took place at the time of the Offering in 2005. The trial court cautioned the Plaintiffs to plead the case with more specificity, but the SAC does not explain how the Defendants in this appeal had a duty to investigate and disclose the plans for the Highway Widening in 2005. In their oppositions to the demurrers to the SAC, Plaintiffs acknowledge the Highway Widening plans were public knowledge at the time of the Offering in September 2005. The city's project was the subject of public hearings from 1999 to 2005.

Plaintiffs argue they were "geographically disbursed throughout multiple states and unaware of the public hearings." Plaintiffs maintain they had no duty to attend public hearings taking place before they knew about the Offering, and they should not be "burdened with the responsibly of attending hearings" during the 45 turn around period

of a Internal Revenue Code section1031 real estate exchange. They suggest, without citing to legal authority, the investors were entitled to rely on "their fiduciaries to disclose information of such crucial importance." This argument begs the following question: Who exactly was responsible? The SAC reveals Plaintiffs believed the responsible fiduciaries were the "due diligence professionals related to the property" and specifically named the "ARGUS Defendants" and the "BLAKE Defendants".

If we assume, for the sake of argument, Plaintiffs were legally excused from discovering matters of public knowledge, we still conclude the demurrers were properly sustained without leave to amend. We find it very telling that Plaintiffs do not assert in any version of their complaint that the "due diligence professionals" actually knew about the Highway Widening plans and wrongfully withheld the information. Rather, Plaintiffs complain the information "was available" and "would have been known had the same been investigated." In the SAC, Plaintiffs specify only two due diligence professionals who were responsible for such an investigation. They do not allege facts suggesting how these professionals or their duties extended to unrelated brokers (CBRE & Burch), the lender LaSalle, or the Hirschler law firm. And Plaintiffs do not suggest how they could amend the complaint to allege these Defendants could be liable for the alleged failure of others who allegedly owed Plaintiffs the duty to investigate road improvement plans.

DISPOSITION

The judgments are affirmed.  Respondents shall recover costs incurred on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.